ELEANOR V. N. FABER AND E. CORNING FABER, HER HUSBAND, PLAINTIFFS-APPELLANTS, v. EDWIN R. CRESWICK AND BERNICE K. CRESWICK, DEFENDANTS-RESPONDENTS.

Argued October 13, 1959—Decided December 7, 1959.

*Mr. John T. Keefe* argued the cause for plaintiffs-appellants.

*Mr. John J. Gaffey* argued the cause for defendants-respondents (*Messrs. Gaffey & Webb,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. This is a landlord and tenant personal injury negligence case. At the close of the plaintiffs' proof, the Law Division of the Superior Court granted the defendants' motion for judgment. Thereafter, an appeal was taken and while it was pending in the Appellate Division, we granted certification.

██ Defendants Edwin R. Creswick and Bernice K. Creswick, husband and wife, are owners by the entirety of a one-family house in Little Silver, New Jersey. Plaintiff E. Corning Faber rented the premises for the 1956 summer season under a written lease made with defendant Edwin R. Creswick. Negotiations for the rental were carried on between their wives. At the trial and on the appeal, much attention was devoted to a claim that an oral lease was in fact consummated by the two women. On that issue, although it is obvious that Mrs. Creswick authorized and consented to the making of the lease, it is our opinion that the written document superseded the oral negotiations and that Mrs. Faber was not a party to the rental contract.

The living quarters of the house were on the first floor. The second story as originally constructed was an open attic. Mr. Creswick, at some time prior to the letting, undertook to improve the attic as a "do it yourself project." He built partitions of sheet rock or plaster board and created a room or rooms and a hallway, entrance to which was gained by a stairway leading from the first floor. At the top of the stairway at the attic floor level, there was a large open stairwell. The evidence adduced at the trial showed that a portion of the stairwell at attic floor level was covered over with a section of sheet rock or plaster board. The inference was plain that Creswick had placed it there or knew of its presence. The photographs in evidence indicate that it rested on two sides on the edge of the flooring, that it was held in place on the third side by a narrow wooden moulding, and that on the edge near the staircase it had no independent support at all.

A person coming up the staircase, on reaching the top, would turn in the opposite direction and walk along a hallway paralleling the stairwell. Opposite the far end of the stairwell, the rear portion of which was covered over by the sheet rock or plaster board, there were two partitioned sections of the attic. One was on the left side of the hallway and the other on the right. The entranceway to the area

on the right was created by plaster board partitions and at the place of entrance the partition on the right at floor level (according to the photographs) was less than a foot from the edge of the stairwell, and particularly from the portion of it which was covered by the sheet rock or plaster board. Thus, one coming out of this area and turning left to go back to the staircase would be likely to walk across a portion of the plaster board. As far as the record reveals, there was nothing to indicate that such a course should not be taken.

There is no doubt that the use of the attic was an incident of the lease. In fact, the proof demonstrates that while showing the house, Mrs. Creswick specifically mentioned it and advised Mrs. Faber that clothes lines had been installed there for use on rainy days.

In accordance with the understanding reached in the oral negotiations, the lease provided that the lessor would "have the house thoroughly clean and in good order and repair at the beginning of this lease."

The Fabers moved in on July 15, 1956. On July 18 Mrs. Faber went up to the attic for the first time. After depositing certain articles in the area on the left, she crossed over to the room on the right of the hallway to look for the clothes lines. She stood in the entranceway and saw them. On turning to go back to the top of the stairs, she took a step or two across the plaster board. It collapsed under her weight, precipitating her onto the staircase and down to the living room floor. Injuries and expenses, which need not be detailed here, followed.

At the close of the plaintiffs' case, the trial court granted the defense motion for dismissal. He declared that the rights and duties of the parties were controlled by the written lease between Edwin Creswick and E. Corning Faber. Despite the inclusion of an agreement to have the premises in good repair, he held, on the authority of *Clyne v. Helmes,* 61 *N. J. L.* 358 (*Sup. Ct.* 1898), that Mrs. Faber, not being a party to the instrument, could not recover for damages

resulting from a breach of the covenant. And Mr. Faber's claim for consequential losses was denied because, as a derivative cause of action, its legal efficacy depended upon the right of his wife to recover.

## I.

At early common law, when an owner leased premises, there was no implied covenant of habitability, no implied warranty that they were fit or suitable for any particular purpose. The doctrine of *caveat emptor* was applied, the transaction being likened to a sale of an interest in land. No duty on the part of the lessor to repair or maintain the premises arose out of the relationship of the parties. If such a duty came into existence, it was because of express provision in the instrument of rental. In the absence of an agreement to this effect, the obligation to maintain and to repair devolved upon the tenant. *Michaels v. Brookchester, Inc.,* 26 *N. J.* 379 (1958) ; *Folley v. United B. & L. Assn.,* 117 *N. J. L.* 54 (*Sup. Ct.* 1936) ; *Connors v. Newton,* 77 *N. J. L.* 125 (*Sup. Ct.* 1908) ; *Lyon v. Buerman,* 70 *N. J. L.* 620 (*Sup. Ct.* 1904) ; *Mullen v. Rainear,* 45 *N. J. L.* 520 (*Sup. Ct.* 1883) ; *Naumberg v. Young,* 44 *N. J. L.* 331 (*Sup. Ct.* 1882) ; *Salmond on Torts* 528 (*12th ed.* 1957).

Originally, even where the lease or rental agreement contained a covenant by the landlord to repair, judicial construction in the majority of jurisdictions sharply limited the remedy afforded for disregard of the undertaking. The action against the defaulting landlord was treated strictly as one for breach of contract. The *ex contractu* measure of damages was applied and recovery was confined to the cost of making the particular repair. The law took no cognizance of the fact that injuries might have resulted, even to the tenant himself, from the failure of performance. See *Michaels v. Brookchester, Inc., supra,* 26 *N. J.* at *page* 383; *Annotation,* 163 *A. L. R.* 300 (1946) ; *Harkrider,*

*"Tort Liability of a Landlord,"* 26 *Mich. Law Review* 383, 392 (1928); *Note,* 26 *Notre Dame Lawyer* 345, 347 (1951); *Note,* 7 *Temple Law Quarterly* 215, 218 (1933); *Prosser, Law of Torts* (2d ed. 1955) 474. Even as progressive a jurist as Justice Cardozo, then Chief Judge of the New York Court of Appeals, accepted this view. *Cullings v. Goetz,* 256 *N. Y.* 287, 176 *N. E.* 397 (*Ct. App.* 1931).

A number of years ago New Jersey recognized the obvious fact that if a compact to repair is not honored by the landlord, injury is likely to result to the tenant. And our courts espoused the legal concept that where such failure eventuates in injury, a cause of action arises in tort. That is, where there is a negligent omission to perform the duty thus assumed, liability arises for proximate consequential injuries suffered by the tenant. *Smith v. Cruse,* 2 *N. J. Misc.* 350 (*Sup. Ct.* 1924), affirmed 101 *N. J. L.* 82 (*E. & A.* 1925); *Pabst v. Schwarzstein,* 101 *N. J. L.* 431 (*Sup. Ct.* 1925); *Colligan v. 680 Newark Ave. Realty Corp.,* 131 *N. J. L.* 520, dissent at *page* 544 (*E. & A.* 1944); *Michaels v. Brookchester, Inc., supra.* The *Restatement of Torts,* § 357, adopted this view in 1934. In more recent years, many jurisdictions joined the movement toward the theory of responsibility in tort and in 1946, when the Annotation at 163 *A. L. R.* 300, 315, was written, it was regarded as doubtful that a majority of the states still limit the action to one in contract and deny recovery for personal injuries.

Once the restrictive contract thesis was put aside, it was held generally that third persons, such as members of the tenant's family, his invitees, and all those on the premises under his right of possession, were entitled to the benefit of the cause of action. *Mariotti v. Berns,* 114 *Cal. App.* 2d 666, 251 *P.* 2d 72 (*Dist. Ct. App.* 1952); *Scibek v. O'Connell,* 131 *Conn.* 557, 41 *A.* 2d 251 (*Sup. Ct. Err.* 1945); *Alaimo v. DuPont,* 4 *Ill. App.* 2d 85, 123 *N. E.* 2d 583 (*App. Ct.* 1955); *Page v. Ginsberg,* 345 *Ill. App.* 68, 102 *N. E.* 2d 165 (*App. Ct.* 1951); *Miles v. Boston, R. B. & L. R. Co.,* 274 *Mass.* 87, 174 *N. E.* 200, 202 (*Sup. Jud.*

*Ct.* 1931); *Annotation,* 163 *A. L. R., supra* at *p.* 313. The *Restatement of Torts* proclaimed this as the rule which best serves the interests of a modern society. *Section* 357 states it as follows:

"A lessor of land is subject to liability for bodily harm caused to his lessee *and others* upon the land with the consent of the lessee or his sub-lessee by a condition of disrepair existing before or arising after the lessee has taken possession, if
  (a) the lessor, as such, has agreed by a covenant in the lease or otherwise, to keep the land in repair, and
  (b) the disrepair creates an unreasonable risk to persons upon the land which the performance of the lessor's agreement would have prevented." (Emphasis added.)

Although New Jersey had been in the advance guard of the proponents of the tort concept, it declined to abandon the rule of privity. *Clyne v. Helmes, supra.* This doctrinal limitation expressed in 1898 reflected the view announced more than 50 years earlier in the English case of *Winterbottom v. Wright,* 10 *M. & W.* 109, 152 *Eng. Rep.* 402 (*Ex.* 1842), and widely followed thereafter. That was before the distinction between contract and tort came into clear focus and before the recognition of negligence as an independent basis of responsibility. 2 *Harper and James, The Law of Torts* 1039 (1956). Under modern social conditions, the precept of privity is sterile and no longer serves the interests of justice. And this apart from other influences, for the obvious reason that it is utterly unrealistic to say that when the head of a family leases premises and bargains for an agreement on the part of the lessor to maintain them in good repair, the parties do not recognize that the pact is in the interest and for the protection of members of his household and others who enter thereon in his right. It is likewise inconsistent with reality to suggest that the parties do not accept their mutual engagements with a full awareness that if the necessary repairs are not made, the safety of such persons will be endangered.

In recent years, there have been many claims that *Clyne v. Helmes* is archaic and should be abrogated. The last such instance in the highest court of this State occurred in *Colligan v. 680 Newark Ave. Realty Corp., supra.* The proposal was rejected by an evenly divided court and the conflicting views on the subject were set forth forcefully in separate opinions. In our judgment, the present case amply demonstrates that the interests of justice are not served by the doctrine. See *Collopy v. Newark Eye and Ear Infirmary,* 27 *N. J.* 29 (1958); *Colligan v. 680 Newark Ave. Realty Corp., supra,* dissent 131 *N. J. L.* at *pages* 546–548. Accordingly, the doctrine of *Clyne v. Helmes* is overruled and no longer may be considered as the law of this State.

Moreover, even in England, birthplace of the requirement that only persons who are parties to a rental contract can sue on account of a breach, Parliament has abolished it. *Salmond, supra,* at *p.* 530. In that country, because of the hybrid nature of its Parliament and highest court, once a common law doctrine has been established, only Parliament by the exercise of the lawmaking function can alter its fundamental character. *Great Western Railway Company v. Owners of S.S. Mostyn,* 1928 *App. Cas.* 57, 82 (*H. L.* 1927); *London Street Tramways Company v. London County Council,* 1898 *App. Cas.* 375 (*H. L.* 1898); 22 *Halsbury's Laws of England* (*3d ed.* 1958) 798. In this State, the Judiciary suffers from no such limitation. Revision of an outmoded common law rule is within its competence as well as that of the Legislature. *Collopy v. Newark Eye and Ear Infirmary, supra.*

It is not necessary to be concerned at this time with some of the problems which have perplexed the courts of other states and to some extent our own, with respect to the administration of the concept of liability in tort arising out of breach of a contract to repair. In a number of states responsibility has been placed upon the express or implied retention of the right of re-entry to inspect and

maintain the demised premises; others have construed the undertaking to signify the assumption of an obligation to repair only within a reasonable time after the landlord has received notice or acquired knowledge of the dangerous or defective condition. See *Michaels v. Brookchester, Inc., supra; Prosser, supra* 474, 475; 163 *A. L. R., supra* at *p.* 314. In the present case, the express agreement was that the lessor would have the house "in good order and repair at the beginning of this lease." The hazardous condition was known to the defendants while they were in possession and control, and prior to the lessee's entry. Thus, on the facts liability is not dependent upon any consideration of subsequent control by them or further notice to them of the need for repair.

## II.

■■ The evidence adduced at the trial provides another ground upon which responsibility in damages may be predicated. Even in the absence of a covenant to repair, the law has long recognized, as an exception to the general common law tenet, that a landlord, knowing of an actually or deceptively concealed dangerous condition on the premises, is under a duty to disclose it to the tenant at or prior to the transfer of possession. Failure to do so, resulting in injury to the tenant or to a member of his family, gives a cause of action to the injured person. *Earle v. Kuklo,* 26 *N. J. Super.* 471 (*App. Div.* 1953); *Kaylor v. Magill,* 181 *F. 2d* 179 (6 *Cir.* 1950); *Sunasack v. Morey,* 196 *Ill.* 569, 63 *N. E.* 1039 (*Sup. Ct.* 1902); *Kennedy v. Hartwig-Dischinger Realty Co.,* 201 *S. W. 2d* 475 (*Mo. App.* 1947); *Ryan v. State,* 192 *Misc.* 408, 77 *N. Y. S. 2d* 764 (*Ct. Cl.* 1948); 1 *American Law of Property* 269 (1952); *Prosser, supra* at *p.* 466; *Note,* 62 *Harv. L. Rev.* 669 (1949). The *Restatement, supra* § 358, sets forth the pertinent principle succinctly:

"A lessor of land, who conceals or fails to disclose to his lessee any natural or artificial condition involving unreasonable risk of bodily harm to persons upon the land, is subject to liability for such harm caused thereby to the lessee and others on the land with the consent of the lessee or a sublessee after the lessee has taken possession, if

(a) the lessee does not know of the condition or the risk involved therein, and

(b) the lessor knows of the condition and realizes the risk involved therein and has reason to believe that the lessee will not discover the condition or realize the risk."

The landlord's amenability under this principle was argued in the trial court. It seems to have been lost sight of, however, in the course of discussion of *Clyne v. Helmes* and of plaintiffs' claim concerning the existence of an oral as well as a written lease. And no specific ruling was made as to its applicability.

As indicated above, the facts strongly support the inference that the Creswicks were aware of the dangerous condition presented by the plaster board over the stairwell. They did not call it to the attention of the Fabers. And it cannot be said to have been obvious to them. More particularly, the accident occurred during Mrs. Faber's initial use of the attic and her testimony is clear that she had no consciousness of the danger. Manifestly, the circumstances presented an issue of negligence for determination by the jury.

### III.

The judgment is reversed and the cause is remanded for a new trial. Costs to abide the event.

BURLING, J., concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For affirmance*—None.