962 A.2d 542 (2009)
404 N.J. Super. 433
Hermes REYES and Leonor Reyes, Plaintiffs-Appellants/Cross-Respondents,
v.
Harry C. EGNER, Holly Egner, and Prudential Fox & Roach Realtors, Defendants-Respondents/Cross-Appellants, and
Harry C. Egner and Holly Egner, Third-Party Plaintiffs,
v.
Colombia Reyes, Third-Party Defendant/Fourth-Party Plaintiff,
v.
Prudential Fox & Roach Realtors, Fourth-Party Defendant.
No. A-5977-06T3
Superior Court of New Jersey, Appellate Division.
Argued October 6, 2008.
Decided January 8, 2009.
*544 John J. Novak, Toms River, argued the cause for appellants/cross-respondents *545 Hermes Reyes and Leonor Reyes (Law Offices of John J. Novak, P.C., attorneys; Mr. Novak, on the briefs).
William S. Bloom, Edison, argued the cause for respondents/cross-appellants Harry C. Egner and Holly Egner (Methfessel & Werbel, attorneys; Mr. Bloom, on the briefs).
Michael T. Kearns argued the cause for respondent/cross-appellant Prudential Fox & Roach Realtors (Hoagland, Longo, Moran, Dunst & Doukas, LLP, attorneys; Mr. Kearns and Dawn P. Marino, on the brief).
Deborah Plaia, attorney for third-party defendant/fourth party plaintiff Colombia Reyes, has not filed a brief.
Before Judges CARCHMAN, R.B. COLEMAN and SABATINO.
The opinion of the court was delivered by
SABATINO, J.A.D.
In this premises liability case, we consider whether the lessors of a beach house had a duty to correct or warn about what are claimed to be dangerous conditions of their property, presenting hazards that allegedly were not reasonably apparent to a short-term tenant and her guests. The tenant's elderly father, who had been vacationing at the house, was injured when he lost his balance while stepping onto an outside wooden platform. The platform was adjacent to the sliding glass door leading from the master bedroom to a rear deck. There was no handrail available to help plaintiff regain his balance, despite building code provisions that appear to mandate one. He and his wife thereafter filed a personal injury action against the lessors and the real estate broker that had facilitated the two-week lease.
Because the trial court erroneously required plaintiffs to prove that the lessors had actively or fraudulently concealed the allegedly dangerous conditions, we vacate summary judgment entered in the lessors' favor. In doing so, we endorse and apply the principles expressed in Section 358 of the Restatement (Second) of Torts (1965), which does not require proof of such concealment by a lessor in order for liability to attach. However, we affirm the grant of summary judgment as to the broker.

I.
Cognizant that the record is unclear and not fully developed in certain respects, we describe the facts in a light most favorable to plaintiffs as the non-moving parties on summary judgment. R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535, 666 A.2d 146 (1995); see also N.J. Div. of Taxation v. Selective Ins., 399 N.J.Super. 315, 322, 944 A.2d 667 (App. Div.2008) (reaffirming the established principle that appellate courts reviewing summary judgment orders, de novo, apply the same standards of Brill and Rule 4:46 that govern trial courts).
In the spring of 2003, Colombia Reyes ("Colombia") decided to rent a summer house at the Jersey Shore. She anticipated occupying the house, along with her parents and guests, during a two-week period straddling the Labor Day holiday. Colombia obtained a brochure in the mail from a Stone Harbor real estate broker, Prudential Fox & Roach ("Prudential"). She telephoned Prudential's office and spoke to a salesperson. After discussing her needs with the salesperson, Colombia decided to lease a three-bedroom, two-bathroom, single-family house in Stone Harbor. The house is located at 249 103rd Street, a few blocks from the beach. Colombia recalls that she did not visit the property before deciding to lease it. She also did not remember seeing photographs *546 of the property[1] or taking a virtual tour of it on the computer. The property was owned by a husband and wife, Harry and Holly Egner, who had listed the rental with Prudential.
Consequently, in March 2003, Colombia and the Egners entered into a one-page lease typed on a Prudential form, entitled "Seasonal Short Term Lease Agreement." The lease specified that Colombia would rent the property from 1:00 p.m. on Saturday, August 23, 2003, through 10:00 a.m. on Saturday, September 6, 2003. The rent was $4,050, payable in three advance installments. Colombia paid the three installments, plus a $500 security deposit. She denies coming to the property in the interim from March 2003 until the lease began in August.[2] For its efforts in procuring the lease, Prudential charged the Egners a commission of twelve percent, or $486.
The house includes an elevated rear deck adjacent to the master bedroom. The deck was built in 1994 by previous owners. It is approximately four feet wide, and leads to a six-step stairway connected to the ground below. The deck is accessible through sliding glass doors in the master bedroom which open to a small wooden platform on the top of the deck. The platform is about seven inches below the bottom of the sliding door. There is another six-and-a-half-inch drop from the platform to the deck, slightly less than the drop from the glass door to the platform.
The wooden boards of the deck and the platform run in the same direction and are essentially the same color. The boards are also similar in color to the wood flooring in the master bedroom, although the boards in the bedroom run in a perpendicular direction. There are no signs cautioning guests about the drop from the sliding door to the platform or from the platform to the deck. In addition, there are no handrails attached to either the platform or the deck. It is undisputed that the municipality did not conduct a final inspection of the deck when it was built and that a building certificate for the deck was not issued.
Colombia and her parents, Hermes Reyes ("plaintiff") and Leonor Reyes,[3] came to the property for the first time on Saturday, August 23. Plaintiff's brief on appeal describes him as "an older Hispanic gentlem[a]n whose primary language is Spanish."[4] Plaintiff and Mrs. Reyes had not participated with Colombia in selecting the house or in arranging the lease.
Upon arriving at the house with her parents, Colombia walked in each of the rooms. Everything appeared to her to be in order, except that the house was very hot because the air conditioning was off. Colombia also looked at the backyard, although she did not specifically recall noticing *547 the rear deck at that time. She did acknowledge becoming aware of the deck at some point before her father's fall, although she was unsure of when. Colombia also recalled observing the steps leading to the deck from the backyard. She was aware that the deck lacked a handrail, although she testified that the omission "didn't concern" her at the time.
Colombia's parents moved their things into the master bedroom, where they stayed through the day of plaintiff's accident. Colombia did not go out on the deck herself because it was only accessible from the interior through the master bedroom that her parents were occupying. According to plaintiff's testimony, he and his wife did not venture out on the deck during their first eight days on the premises.
On the second day of Colombia's tenancy, Mr. Egner came to the house and activated the air conditioning. He did so after Colombia had called Prudential to complain that it was not working. The record contains no indication that Mr. Egner discussed with Colombia the deck or anything else about the house other than the air conditioning. In fact, Colombia incorrectly thought that Mr. Egner was a maintenance worker. Mr. Egner recalled going to the premises a second time to try to adjust the air conditioning, but he could not get it to work. That prompted Mr. Egner to call Prudential, which addressed the problem by calling in the original air conditioning installers.
Meanwhile, other relatives and friends of the Reyes' arrived at the property. The record does not indicate that any of them used the deck.
On August 31, 2003, around 3:30 in the afternoon, plaintiff opened the sliding door to go out to the deck. This was the first time he had done so. Looking straight ahead, plaintiff put his foot out of the door, but he did not feel a step or the ground. As a result, he lost his balance. Trying to find something to hold onto, plaintiff unsuccessfully grabbed for chairs that were on the deck, but he proceeded to fall down the stairs, ending up on the ground.
Plaintiff testified that he had expected the surface of the deck would be level with the sliding door. He did not look down because he did not expect a drop. Plaintiff further stated that the unexpected depth of the step from the door to the platform caused him to fall. He also complained about the absence of a handrail, repeatedly stating at his deposition that he had "nothing to hold" when he started falling, and insisting that if he had been able to grasp a handrail he could have resisted his fall.[5]
Plaintiff injured his back as a result of his fall. Immediately following the accident, he was unable to walk. Plaintiff had to be lifted by his daughter and grandson into a car that transported him to the hospital.
Plaintiff was admitted to the hospital for five days. He then was discharged to a rehabilitation facility, where he was treated for over five weeks. Plaintiff alleges that the injuries to his back are severe and permanent.
The Egners bought the home as a summer rental property in February 2003, about six months before Colombia's two-week stay. After their purchase, the Egners entered into an agreement with Prudential, authorizing Prudential to list the *548 property and collect rent. Prudential also maintained the rental bookkeeping. In addition, the Egners authorized Prudential under their brokerage agreement "to make necessary emergency repairs to [their] property and/or appliances and to provide necessary cleaning not to exceed $100.00."
Shortly after they purchased the property, the Egners had a small porch installed in the front of the house. The porch had handrails and stairs, which were included after their contractor advised them that such features were necessary. They did not, however, make any modifications at that time to the rear deck.
According to Lynn Merkle, Prudential's office and rental manager, she conducted a walk-through of the property at the time the house was listed for rental. Merkle stated that the walk-through consisted of taking photographs and doing inventory, including checking the number of bedrooms, chairs, televisions, and other major contents. She did not notice any "glaring" safety problems. Merkle asserted that Prudential does not conduct property management, a function which it considered to be the owners' responsibility. The Egners themselves did not conduct any inspection of the house prior to advertising it for lease.
Following plaintiff's mishap, Mr. Egner performed certain repairs and improvements. In the spring of 2004, Mr. Egner painted a white strip around the platform of the deck. The strip makes more prominent the edge of the platform before the six-and-a-half-inch drop to the deck. He also installed a railing alongside the steps of the deck.[6]
Plaintiffs filed a complaint in the Law Division against the Egners and Prudential, alleging negligence, breach of the implied warranty of habitability, and violations of the Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 to -20. The Egners filed a third-party complaint against Colombia, seeking defense and indemnification. Colombia, in turn, brought a fourth-party complaint against Prudential, seeking contractual indemnification, as well as indemnification based upon alleged breaches of fiduciary duty and CFA violations.
During the course of discovery, plaintiff produced an expert report from a forensic engineer, Alan Meade, P.E. Meade offered the following pertinent opinions:
1. The non-uniformity of the riser heights in the two step stairway [platform] outside the glass sliding door was a hazard to which persons using the stairway were exposed, was a dangerous condition and a cause of [plaintiff's] fall.
2. The lack of conspicuity of the edge of the intermediate step [platform] between the glass sliding door and the deck was a hazard to which persons using the stairway were exposed, was a dangerous condition and a cause of [plaintiff's] fall.
3. The difference between the two riser heights going from the first floor of the house to the rear deck was a violation of the New Jersey Uniform Construction Code.
4. The lack of a handrail along the six step stairway was a dangerous condition and a cause of [plaintiff's] fall.
5. The lack of a handrail along the six step stairway was a violation of the *549 New Jersey Uniform Construction Code.
Meade cited a nationally-recognized study performed by John Templer[7] regarding the hazards caused by the non-uniformity of step dimensions and the safety advantages of handrails. Meade determined that there was a "lack of conspicuity" between the platform and the deck because they were essentially the same color. He opined that this created a dangerous condition. This hazard could have been avoided, according to Meade, had the perimeter of the platform been painted a different color, or had a handrail for the platform been installed.
In his deposition, Meade explained that plaintiff had lost his balance in stepping from the bedroom to the platform, and then had stumbled across the deck, because of the "same coloration of the wood." Meade emphasized that the color of the platform blended into the color of the deck, thereby creating the lack of conspicuity between the platform and the deck. According to Meade, it was not obvious to plaintiff that there was a step down. Nonetheless, Meade indicated that it was "not completely clear from which step [plaintiff] fell."
With respect to the absence of a handrail, Meade referred in his deposition to Templer's research, which showed that a handrail is useful in providing a person with a "fair chance" of aborting a fall and avoiding injury. Meade concluded that the lack of a handrail in this instance denied plaintiff a chance to save himself and that it also constituted a violation of the New Jersey Uniform Construction Code, N.J.S.A. 52:27D-119 to -141 ("the UCC").[8]
To establish Prudential's alleged liability, plaintiffs offered an expert report from Mel Lissner, the owner of a real estate agency and a school for real estate brokers. Lissner opined that Prudential had a duty under N.J.A.C. 11:5-6.4[9] to conduct a visual inspection of the property. He stated that such an inspection should have included examining whether there was anything materially affecting the property, including any latent defects. Lissner maintained that Prudential had a duty to conduct an inspection in order to assure that the dwelling was safe and habitable and that Prudential breached such a duty here.
The Egners did not retain a liability expert. However, Prudential presented an expert report from Diane Disbrow, the past chairperson of the Ocean County Board of Realtors. Disbrow opined that Prudential did not have an obligation to conduct an inspection and that the Egners' rental agreement imposed no such duty. In addition, Disbrow asserted that Prudential met the requirements of N.J.A.C. 11:5-6.4, in that it had made a reasonable effort to ascertain information about the physical condition of the property.
Following discovery, the Law Division granted Colombia's motion for partial summary judgment with respect to several counts of the Egners' third-party complaint that are not at issue on this appeal. Colombia and Prudential then entered into a stipulation of dismissal with prejudice *550 as to the contractual indemnification count of the fourth-party complaint.
Defendants subsequently filed motions for partial summary judgment addressed to the issue of causation. Plaintiff filed a cross-motion, seeking a determination by the court that the deck platform and the lack of a handrail each constituted dangerous conditions.
Oral argument on those competing motions was presented to a Law Division judge[10] in January 2007. During that oral argument, the first motion judge observed, in colloquy, that:

if you look at that picture out the bedroom door, it appears that you're walking onto a single space, that's the way it appears to this [c]ourt. It could be an optical illusion. Could you argue to the jury that it's not logical? You could. But for a motion for judgment on proximate cause, it just seems to me that this is what thethe legal discussion of distraction is all about. That there are times when we're distracted from what seems to be the obvious. But in here there's something additional. You can't tell that you have got a step before the deck.

[(Emphasis added).]
The first motion judge granted defendants' motions solely as to plaintiffs' causation claims associated with the height differentials on the steps and risers but otherwise denied the motions.
In particular, the first motion judge found that the lack of consistency in the riser height of the intermediate step leading from the master bedroom to the platform was not a proximate cause of plaintiff's fall. Apart from that discrete claim, the judge found that the issue of proximate causation was for the jury. Additionally, the judge also denied plaintiffs' cross-motion, leaving the presence or absence of dangerous conditions as an issue to be resolved at trial.
Plaintiffs then filed a motion seeking a determination that Prudential had a duty to conduct a reasonable inspection of the property and to warn others of patent defects. On March 16, 2007, the second motion judge issued a written decision denying that motion. The judge instead found, as a matter of law, that Prudential owed no such duty of care to plaintiffs. Consequently, the judge granted summary judgment to Prudential.
In his written decision dismissing Prudential as a defendant, the second motion judge emphasized that Prudential had not contracted with the Egners to make repairs or to reinspect the property. The judge also observed that Prudential received "only a nominal fee" from the lease agreement. Taking into account the nature of the parties' relationship, the attendant risks, and the opportunity and ability of each party to exercise care, the judge concluded that "it would be unjust to impose a duty upon Prudential" to have performed an inspection for plaintiffs' protection.[11]
The Egners likewise moved for summary judgment. In their motion argument, the Egners principally relied upon *551 this court's opinion in Patton v. The Texas Co., 13 N.J.Super. 42, 47, 80 A.2d 231 (App.Div.), certif. denied, 7 N.J. 348, 81 A.2d 522 (1951), which held that a lessor of a residence is not liable for injuries sustained by a tenant's guest arising from a latent defect on the premises, unless there has been "fraudulent concealment" of that defect.
The second motion judge granted the Egners summary judgment in an oral opinion he rendered on May 1, 2007. In essence, the judge adopted the Egners' reliance upon Patton as the basis for precluding the Egners' liability as lessors. The judge further concluded that, as a matter of law, the defects complained of here by plaintiffs were all patent, not latent, and that "there was no concealment of a latent defect." Plaintiffs' ensuing motion for reconsideration was denied.
Plaintiffs appeal the Law Division's orders, respectively granting summary judgment to the Egners and Prudential. Defendants, in turn, cross-appeal the trial court's denial of their motion for partial summary judgment on the remaining issues of proximate cause.

II.
The law of premises liability has markedly evolved over time. The common law traditionally hinged a landowner's legal duty to compensate a person injured on the premises upon whether that person was classified as either a trespasser, a licensee or social guest, or a business invitee. See, e.g., Snyder v. I. Jay Realty, 30 N.J. 303, 153 A.2d 1 (1959). These rigid classifications were rooted in "social mores that placed a paramount value on pastoral and agrarian ideals," by which the courts "strove to maximize the protection of [the] rights of landowners to use and enjoy their land." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 436, 625 A.2d 1110 (1993). As society became less agrarian and more complex, these strict legal categories gave way to "a more resilient approach to premises liability." Id. at 436-39, 625 A.2d 1110. That modern approach is less dependent upon absolute rules in determining matters of legal duty, and instead is informed by multiple factors of fairness and public policy. Ibid.
With particular respect to the responsibilities of a landowner who leases its property, the common law essentially adhered to a "caveat lessee" approach. That approach substantially limited a lessor's duty to maintain safe premises for its tenants.
The tenant, at least where he had the opportunity to inspect the premises before taking them, was held to accept them in their existing condition, and the landlord could not be liable for any defect therein except where he had expressly warranted against it or had been guilty of fraudulent concealment.

[W. E. Shipley, Modern Status of Rule Requiring Actual Knowledge of Latent Defect of Leased Premises as a Prerequisite to Landlord's Liability to Tenant Injured Thereby, 88 A.L.R.2d 586, at § 2 (1963) (emphasis added).]
This constricted notion of a lessor's duty was legislatively superseded in our State by the comprehensive statutes governing residential landlords and tenants, and associated laws requiring such leaseholds to be habitable. See, e.g., N.J.S.A. 2A:18-61.1 to -61.2. (the Anti-Eviction Act). Those statutes, however, are aimed at the terms of the tenancy itself, as opposed to the separate and distinct question of when a landlord should be liable in tort to persons who are injured by dangerous conditions on the leased premises. Dwyer v. Skyline Apts., Inc., 123 N.J.Super. 48, 55, 301 A.2d 463 (App.Div.), aff'd o.b., 63 N.J. 577, 311 A.2d 1 (1973).
*552 For many years, the dominant view among courts was that a landlord would not have a duty under negligence law to protect others against dangerous conditions on his or her property, unless he or she had actual knowledge of the hazard, and the lessee was ignorant of it. This narrow approach was reflected in the First Restatement of Torts promulgated in 1934 ("the First Restatement"). In particular, Section 358 of the First Restatement provided:
§ 358 Concealed Dangerous Conditions Known To Lessor
A lessor of land, who conceals or fails to disclose to his lessee any natural or artificial condition involving unreasonable risk of bodily harm to persons upon the land, is subject to liability for such harm caused thereby to the lessee and others on the land with the consent of the lessee or a sublessee after the lessee has taken possession, if
(a) the lessee does not know of the condition or the risk involved therein, and
(b) the lessor knows of the condition and realizes the risk involved therein and has reason to believe that the lessee will not discover the condition or realize the risk.
[First Restatement of Torts, § 358 (1935) (emphasis added).]
A substantial portion of the published commentary accompanying Section 358 of the First Restatement focused upon whether the lessor "concealed" the dangerous condition from the lessee. This was reflected by the very heading of that section ("Concealed Dangerous Condition Known to Lessor").
Hence, "[a] lessor who deliberately conceals a known dangerous defect" to a lessee would generally be liable under the First Restatement for harm resulting from that condition. Id. at cmt. (b) (emphasis added). Such extreme conduct by a lessor warranted presumptive liability to an unwitting lessee. On the other hand, a lessor who simply had "reason to know" about a defect, and no more than that, would not have been liable under the First Restatement's formulation. Ibid. Under that construct, a lessor could, in effect, put his or her "head in the sand" to evade liability for injuries occurring on the lessor's dangerous premises.
In 1951, a panel of this court addressed and applied these traditional concepts in Patton, supra, 13 N.J.Super. at 44, 80 A.2d 231. In Patton, the plaintiff was a guest in his daughter's house that had been leased from the defendant for four years. He was hurt when a step leading to the sidewalk gave way, causing him to fall. The construction of the steps by the defendant's predecessor-in-title was faulty, and the condition of the step in question had worsened after the tenants took possession. Ibid. The defendant had refused the tenants' request before the accident to repair the step. Ibid.
We held in Patton that the defendant did not have a contractual duty to make repairs at its tenants' request because it had not agreed to do so. Id. at 45-46, 80 A.2d 231. In addition, we concluded that because the defect in question was not latent, the defendant was not liable to the plaintiff as an invitee. Id. at 46, 80 A.2d 231. Significantly, the opinion added:
The established general rule in this State is that upon the letting of a house and lot there is no implied warranty or condition that the premises are fit and suitable for the use to which the lessee proposes to devote them and the landlord is therefore under no liability for injuries sustained by the tenant or the tenant's invitee by reason of the ruinous condition of the ... premises unless there has been fraudulent concealment of a latent defect.

*553 [Id. at 47, 80 A.2d 231 (emphasis added).]
The language in Patton underscored above tracks the principles espoused in Section 358 of the First Restatement. It also derives from the First Restatement's commentary that focuses upon proof of "concealment" by a lessor as a predicate to liability. In fact, Patton made the concealment element even more extreme, by requiring that the concealment be "fraudulent" (a qualifier not expressed in the Restatement), and also by omitting the Restatement's alternative to proof of concealment, i.e., a lessor's "failure to disclose" a defect of which it was aware of and which the lessee will not discover.
Fourteen years after Patton was decided, the American Law Institute issued the Restatement (Second) of Torts ("the Second Restatement"). In that seminal 1965 document, the drafters revised, among other things, the Restatement's principles of premises liability, so as to expand the scope of a lessor's duty to a lessee. This expansion recognized the host of exceptions that had evolved in modern case law to the general rule exempting a lessor from responsibility for injuries occurring on the property after a lessee has taken possession.
As the Reporter's Note to Section 356 of the Second Restatement indicates:
These exceptions have been due in large part to increasing recognition of the fact that tenants who lease defective premises are likely to be impecunious and unable to make the necessary repairs which their own safety and that of others may demand; that one who is in possession of the premises only for a limited term does not have the same incentive to maintain them in good condition as the lessor to whom they will revert at the end of the lease; and that the landlord who receives benefit from the transaction in the form of rent may properly be required to assume in return at least certain limited obligations with respect to the safety of others. These ideas of policy have found expression in statutes in a number of states which require landlords to put and keep certain types of premises, such as multiple dwellings, in good condition and repair.
[Restatement (Second) of Torts, § 356 cmt. (a) (1965) (emphasis added).]
On the whole, Section 358 of the Second Restatement places less emphasis on a lessor's "concealment" of a dangerous condition than the First Restatement. The title of Section 358, in fact, was revised to "Undisclosed Dangerous Conditions Known to Lessor," rather than "Concealed" Conditions, as specified in the First Restatement. Substantively, the text of Section 358 expands liability from lessors who possess actual knowledge of defective conditions on their premises to lessors who simply have "reason to know" of those conditions. Ibid. Likewise, the newer version of Section 358 covers lessors who "should realize" the risks involved, rather than just lessors who actually "realize" such risks. Ibid. Additionally, the lessor's duty runs not only to a lessee who "does not know" of the dangerous condition or the risk involved, but also to a lessee who lacks "reason to know" of those dangers and risks. Ibid.
The full text of Section 358 of the Second Restatement is as follows:
§ 358 Undisclosed Dangerous Conditions Known to Lessor
(1) A lessor of land who conceals or fails to disclose to his lessee any condition, whether natural or artificial, which involves unreasonable risk of physical harm to persons on the land, is subject to liability to the lessee and others upon the land with the consent of the lessee or *554 his sublessee for physical harm caused by the condition after the lessee has taken possession, if
(a) the lessee does not know or have reason to know of the condition or the risk involved, and
(b) the lessor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to expect that the lessee will not discover the condition or realize the risk.
(2) If the lessor actively conceals the condition, the liability stated in Subsection (1) [immediately above] continues until the lessee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition and to take such precautions.
[(Emphasis added).]
The Reporter's Notes to this revised provision expressly indicate that "[t]he liability [of the lessor] extends to members of the family of the lessee." Ibid.; see also Faber v. Creswick, 31 N.J. 234, 156 A.2d 252 (1959) (extending a lessor's liability for the dangerous condition of a stairwell to the lessee's wife, despite the fact that she was not a signatory to the lease).
Our courts have frequently embraced the principles set forth in the Second Restatement on issues of premises liability. For example, in Parks v. Rogers, 176 N.J. 491, 825 A.2d 1128 (2003), our Supreme Court cited and relied upon the Second Restatement in holding that a landlord owed a duty of care to a social guest who had been injured when she fell down a dark stairway with a truncated handrail. Id. at 498-99, 825 A.2d 1128. See also Tighe v. Peterson, 356 N.J.Super. 322, 326, 812 A.2d 423 (App.Div.), aff'd, 175 N.J. 240, 242, 814 A.2d 1066 (2002); Vallillo v. Muskin Corp., 218 N.J.Super. 472, 476-77, 528 A.2d 53 (App.Div.), certif. denied, 109 N.J. 496, 537 A.2d 1287 (1987); Giordano v. Mariano, 112 N.J.Super. 311, 314-15, 271 A.2d 20 (App.Div.1970). Notably, the plaintiff in Parks was, as is the case here, a visitor to a beach house, although the defendant there was a property owner in possession, rather than a lessor. Parks, supra, 176 N.J. at 494, 825 A.2d 1128.
The liability principles of Section 358 of the Second Restatement have been adopted and applied in numerous other jurisdictions. Those applications have arisen in a diverse array of factual settings.[12]
*555 Plaintiffs acknowledge that the Egners did not conceal, fraudulently or otherwise, the alleged dangerous conditions of the deck and the deck platform. Nevertheless, they argue that the Egners owed a duty of care to them even in the absence of such concealment. They maintain that the trial court erred in determining that Patton foreclosed their cause of action against the lessors here as a matter of law. To the extent that Patton is read to apply to the present circumstances, plaintiffs urge that we reconsider its requirement of proof of fraudulent concealment.
The Egners argue that Patton remains good law, and that the trial court properly applied that precedent in dismissing plaintiffs' claims against them. To buttress their reliance upon Patton, the Egners cite to our subsequent opinion in Szeles v. Vena, 321 N.J.Super. 601, 729 A.2d 1064 (App.Div.), certif. denied, 162 N.J. 129, 741 A.2d 97 (1999). In Szeles, a tenant, three years into the lease of a single-family home, injured himself as a result of a fall on an exterior staircase when a brick allegedly came loose. Id. at 602, 729 A.2d 1064. The tenant filed suit against the landlord, claiming breach of the duty of care and the implied warranty of habitability. Ibid. At no time prior to the accident did the tenant notice that the brick or the step in question was loose, and he never contacted the landlord about the problem. Id. at 603-04, 729 A.2d 1064.
In upholding the trial court's grant of summary judgment in favor of the landlord, we concluded in Szeles that any defect with the step was patent, and was not a concealed condition. Ibid. We also underscored the tenant's failure to bring the condition to the attention of the landlord. Ibid. Mindful of the three years that had passed since the tenant took possession, we considered it inappropriate to charge the lessor with responsibility for such a dangerous condition "this long after the lease inception date." Id. at 607-08, 729 A.2d 1064.
As to the continued vitality of Patton, we acknowledged in Szeles that there have been "obvious inroads" in the law concerning the responsibilities of lessors to maintain safe premises, "particularly involving multi-family dwellings." Id. at 606, 729 A.2d 1064. In that regard, we recognized in Szeles cases decided after Patton that have imputed into residential leases implied warranties and covenants of habitability. Id. at 607, 729 A.2d 1064. See, e.g., Berzito v. Gambino, 63 N.J. 460, 466, 308 A.2d 17 (1973); Marini v. Ireland, 56 N.J. 130, 144, 265 A.2d 526 (1970). Even so, we concluded that "the Marini concept was not intended to overturn existing principles of law applicable to tort actions for personal injuries by tenants against landlords." Id. at 607, 265 A.2d 526. Recognizing that the Supreme Court had not yet modified or rejected Patton, we opted in Szeles to "leave any change of the law of such a substantial nature for consideration by that Court[.]" Ibid.
After carefully considering these developments in the law and the factual record before us, we conclude that the requirements of Patton and, for that matter, Szeles, do not squarely apply to the present case. We reach that conclusion mainly because of the short-term nature of the leasing arrangement here.
This case arises out of a two-week rental of a vacation house at the Jersey Shore. That context is fundamentally different from the multi-year tenancies presented in *556 Patton[13] and in Szeles. Knowing that their occupancy is of a short-term nature, vacation renters generally are not apt to perform as thorough an inspection of the premises as tenants who expect to remain for significant periods of time. The distance between the vacation property and the tenant's permanent residence often can make it inconvenient or impossible for the tenant to inspect the property before signing a lease. Although we do not recommend that practice, it is not unusual. Here, Colombia and her parents did not see this rented shore house, first hand, until they arrived with their belongings on the Saturday afternoon when the lease commenced.
Short-term renters, upon arriving at their vacation retreat, are likely to pay more attention to suitcases, beach umbrellas, fishing poles, and animated children than to tasks such as a full-fledged structural inspection of the rented premises. Vacationers typically will be thinking about leisure and family pursuits, not things like platform conspicuity and missing handrails. This contrasts with the circumstances in Szeles, where we found the tenant's lengthy occupancy there made it unfair to impose liability on the lessor. The time element also corresponds to the Reporter's Note to Section 358, underscoring that "one who is in possession of the premises only for a limited term" lacks the same incentive to maintain the premises "as the lessor to whom they will revert at the end of the lease." Second Restatement, § 358, cmt. (a).
On the other hand, the lessors of such vacation premises, anticipating frequent turnover of renters and sustained income on their investments, usually will be in a better position to guard against dangerous conditions on the premises that might injure unwary tenants and their guests. It is not uncommon for such lessors to make use of such premises themselves during holidays and rental off-seasons, when they should have a first-hand opportunity to spot problems or hazards.
Given these special characteristics of a vacation rental, the holdings of Patton and Szeles are not squarely on point. Requiring proof of a lessor's fraudulent concealment in order for one of the lessee's guests to recover in tort is inappropriate in the particularized setting of a short-term vacation rental.
Instead, we hold that the lessors' duty should be defined consistent with the precepts of Section 358 of the Second Restatement. As we have noted, that provision permits liability, even in the absence of a lessor's concealment, if the plaintiff demonstrates that the lessor has failed to disclose a condition "which involves unreasonable risk of physical harm to persons on the land" if "(a) the lessee does not know or have reason to know of the condition or risk involved, and (b) the lessor knows or has reason to know of the condition, and realizes or should realize the risk involved, and has reason to expect that the lessee will not discover the condition or realize the risk." Ibid.
Regarding the absence of handrails on the deck, plaintiffs offer another compelling reason here for distinguishing Patton and Szeles. That reason stems from plaintiffs' contention that the lack of handrails violates requirements set forth in state statutes and regulations and in local construction ordinances. See generally N.J.S.A. 52:27D-119 to -141. In particular, Meade, plaintiffs' engineering expert, asserts that the pertinent construction codes require handrails on this deck. *557 Meade refers, although without specific citation, to standards promulgated by the Council of American Building Officials ("CABO") in 1992, which he contends require a handrail along one side of stairways with three or more risers.[14]
Plaintiffs also rely upon an August 2006 letter in the record from Meade, detailing a conversation he had with a representative of the Stone Harbor construction office. According to this letter, the representative confirmed that when this house's deck and platform were constructed in 1994, a handrail was required. He also confirmed that the municipality, if it had been duly requested to conduct a final inspection of the deck work, "would not have approved the construction if there was no handrail."
The Egners do not contest in their briefs that the pertinent code provisions require a handrail on one side of the deck. Instead, they argue that the deck's supposed code violations do not confer a private cause of action upon plaintiffs, because the Legislature has not specifically codified such a private right. See R.J. Gaydos Ins. Agency v. Nat'l Consumer Ins. Co., 168 N.J. 255, 271, 773 A.2d 1132 (2001). Absent such codification, the Egners claim that any code violations here are inconsequential. They also emphasize that they did not own the property when the allegedly non-compliant deck was built.
We need not resolve on this limited record whether state or local building codes required a handrail on this deck, although such a handrail requirement set forth in N.J.A.C. 5:10-7.7(a) does seem on point. We disagree with the lessors that such code violations, if proven, are inconsequential. The fact that the Egners bought the house years after the deck was built does not insulate them from responsibility. As we have observed in another context, an owner of property is "directly responsible for compliance" with the building codes, even if a developer who previously had title to the property had built the offending component of the dwelling. DKM Residential Properties Corp. v. Twp. of Montgomery, 363 N.J.Super. 80, 93, 831 A.2d 110 (App.Div.2003).
Although we do not, and need not, recognize a private cause of action here stemming from any construction code violations, we are satisfied that such violations may be evidential if not conclusive of the lessors' potential breach of a duty concerning the handrail. Such an approach conforms with established precedents treating statutory or regulatory violations as non-dispositive proof of negligence.
It is well settled that "the violation of a statutory duty of care is not conclusive on the issue of negligence in a civil action but it is a circumstance which the trier of fact should consider in assessing liability." Braitman v. Overlook Terrace Corp., 68 N.J. 368, 385, 346 A.2d 76 (1975) (holding a landlord liable who did not supply deadbolts to tenants in violation of statute). Moreover, "regulations [enacted under a] statute do not create separate causes of action for their violation but they do create standards of conduct of which a jury in a negligence action `should take into consideration.'" (quoting Horbal v. McNeil, 66 N.J. 99, 103, 328 A.2d 604 (1974)). See also Frugis v. Bracigliano, *558 177 N.J. 250, 271, 827 A.2d 1040 (2003) (noting that the violation of an administrative regulation requiring school rooms to have unobstructed safety-vision panels was relevant evidence of negligent conduct, although it was not proof of negligence per se).
The Supreme Court's opinion in Parks v. Rogers, 176 N.J. 491, 825 A.2d 1128 (2003), a case similarly involving a stairway accident at a beach house, is especially pertinent. In Parks, the plaintiff, a social guest, had entered a beach house via a two-flight stairway to a second floor exterior deck without incident. Id. at 495, 825 A.2d 1128. The plaintiff broke her ankle as she descended the stairs approximately twenty minutes later in the dark, because the handrail ended on the second-to-last step. Ibid. The plaintiff did not see the handrail's short terminus when she had ascended the steps. Ibid. The plaintiff's expert report cited the handrail defect, noting that the handrail was not compliant with the UCC. Id. at 495-96, 825 A.2d 1128.
In reversing summary judgment granted to the premises owner, the Court in Parks reaffirmed the "well-settled principle that a homeowner has a duty to warn the unwary social guest of a condition of the premises that the homeowner knows or has reason to know creates an unreasonable risk of injury." Id. at 494, 825 A.2d 1128. As part of its recitation of the pertinent facts, the Court specifically referred to provisions in the UCC and the related subcode, mandating "that handrails extend at least twelve inches beyond the bottom riser of a stairway." Id. at 496 n. 1, 825 A.2d 1128. Although the Court did not comment further in its legal analysis about those code provisions, it did conclude that "a jury must decide [on remand] whether the handrail was an inadequate length," implicitly treating the code violations as non-dispositive of negligence but nevertheless evidential. Id. at 502, 825 A.2d 1128. Presumably, if the Court believed that the code violations in Parks were inadmissible or irrelevant to the question of the property-owner's duty, it would have said so. Although Parks did not involve leased premises, we discern no reason for treating the alleged code violations here any differently. By contrast, no such code violations were identified in Patton or Szeles.
Even if we were to read Patton as applicable to the present fact pattern, we hesitate to continue to impose upon plaintiffs an inflexible doctrinal requirement of proving the lessor's "fraudulent concealment" of a dangerous condition. As we have pointed out, the "fraudulent concealment" requirement expressed in Patton was not embodied in the subsequently-enacted Section 358 of the Second Restatement. The revised Section 358 instead treats the scenario of a lessor's concealment only as a subset of the situations in which liability can attach. Id. at subsection (2) ("If the lessor actively conceals the condition, the liability stated in Subsection (1) continues until the lessee discovers it and his reasonable opportunity to take effective precautions against it.").[15]
It is also significant that Patton has been cited in only one published New Jersey opinion other than Szeles, in the fifty-seven years since it was decided in 1951. In that single additional citation, Milacci v. Mato Realty Co. Inc., 217 N.J.Super. 297, 525 A.2d 1120 (App.Div.1987), we considered a personal injury action brought by an invitee who had fallen on an accumulation of debris on a step leading out of an *559 unemployment office. The premises were leased by the State from a private owner, which had ceded exclusive control of the premises to the State during the term of the lease. Id. at 301, 525 A.2d 1120. The State, in turn, had contracted with a janitorial service company to maintain the premises. Id. at 299, 525 A.2d 1120. We do not consider those circumstances in Milacci comparable to the present short-term rental setting, where no such exclusive control and no maintenance responsibilities were delegated to the tenant. See also Geringer v. Hartz Mountain Devel. Corp., 388 N.J.Super. 392, 401-02 (App.Div.2006) (holding that a landlord that had entered into a "triple net" lease with a commercial tenant, which clearly delegated to the tenant full responsibilities for maintenance and repair, was not liable for negligent maintenance or repair of a stair that the tenant had constructed within its leased space). We are satisfied that the liability standards of Patton are inapplicable to the present context of a short-term vacation rental.
For these many reasons, we conclude that the second motion judge erred, as a matter of law, in finding that the Egners owed no duty to plaintiffs and to their daughter regarding the allegedly-hazardous condition of the deck, absent proof of the Egners' fraudulent concealment. Instead, a proper evaluation of the lessor's duty should turn on the factors expressed in Section 358 of the Second Restatement, i.e., (1) whether the Egners had at least "reason to know" of the allegedly dangerous condition and the risks involved; and (2) whether Colombia, as the lessee, did not know or have reason to know of the condition and the associated risk. After carefully reviewing the record, we are satisfied that there are genuine issues of material fact on these critical points, at least as to the alleged lack of visual conspicuity of the wooden platform.
The record, viewed in a light most favorable to plaintiffs, raises genuine issues as to whether the drop-offs to and from the platform would have been reasonably noticed from within the master bedroom by a vacationing lessee. The color photographs in the record that we have examined reasonably support such a claim of hazard. So does the unrebutted expert report from Meade. See also Geringer, supra, 388 N.J.Super. at 405, 908 A.2d 837 (noting that the "visual prominence of an elevation change" on a carpeted stair, having the "same color" as the floor on both ends, raised factual issues of a hazard that precluded summary judgment on plaintiff's design-defect claims). Likewise, genuine factual issues exist as to whether the Egners, who had only owned the house for a few months themselves, knew about or had reason to know of this potential visual hazard.
The second motion judge ruled that the visual defects with the platform and deck were patent, not latent, but we are not so certain. Plaintiffs' claim about a lack of "conspicuity" is, in essence, a claim of latency. The evidence concerning that defect claim is not so "one-sided," see Brill, supra, 142 N.J. at 533, 666 A.2d 146, to permit a definitive conclusion.[16] The issue should be sorted out by a jury, along with the other unresolved factual issues.
However, with respect to the handrail, Colombia acknowledged in her deposition testimony that she was aware, at some point before her father's accident, that the deck had no such feature. It is *560 immaterial that the lack of a handrail did not "concern" her at the time. Her awareness of that particular dangerous condition, as the lessee of the premises, absolves the Egners of liability for the handrail under Section 358 of the Second Restatement.
Mindful that the scope of a legal duty is a question of law for the court, see Rogers v. Bree, 329 N.J.Super. 197, 201, 747 A.2d 299 (App.Div.2000), we therefore vacate the entry of summary judgment in favor of the Egners, solely as to plaintiffs' "lack of conspicuity" claim. We remand the case against the Egners for trial, applying the legal standards that we have articulated in this opinion.

III.
We turn to the trial court's grant of summary judgment to the broker, Prudential. As we shall discuss, the broker's role here is qualitatively different from that of the Egners as property-owners and lessors. Those qualitative differences lead to dissimilar conclusions as to matters of legal duty and the propriety of summary judgment.
Plaintiffs maintain that the trial court erred in granting summary judgment to Prudential because the broker owed them a duty to conduct an inspection of the property, and was both contractually and administratively obligated to perform repairs. In opposition, Prudential argues that under applicable New Jersey case law it did not owe plaintiffs any duty to inspect for safety violations, nor to correct the conditions in question.
In Hopkins, supra, 132 N.J. at 444-45, 625 A.2d 1110, the Supreme Court held that, with respect to the setting of open-house tours, a real estate broker has a duty to conduct a reasonable inspection in accordance with the overall responsibilities and functions of such brokers, and to warn of any such discoverable physical conditions of the property that pose a hazard or danger to such visitors. This inspection should include the safety of prospective buyers and visitors who tour an open house. Id. at 448, 625 A.2d 1110. With respect to latent defects, the Court significantly added:
The duty to conduct a reasonable inspection in the home arises when in connection with an open-house tour such an inspection is a part of the professional services that would be undertaken by a reasonable broker in attempting to sell the house on behalf of its owner and when the broker has had an adequate opportunity to have undertaken that inspection.
The scope of the duty to inspect and warn is limited only to defects that are reasonably discoverable through an ordinary inspection of the home undertaken for purposes of its potential sale. The broker is not responsible for latent defects that are hidden and of which the broker has no actual knowledge.

[Id. at 448-49, 625 A.2d 1110 (emphasis added).]
The Court reasoned in Hopkins that a real estate broker in a sales context receives tangible economic benefits from the relationship with potential buyers who visit the home, beyond the potential sale of the particular property. Id. at 440-41, 625 A.2d 1110. Moreover, "[i]t is highly foreseeable that visitors to an open house could be injured by dangerous conditions during the course of wandering through an unfamiliar house." Id. at 443, 625 A.2d 1110. However, that particular duty does not require a broker to warn against dangerous conditions that are not known to the broker, or which would not be revealed during the course of the inspection that the broker might reasonably discover while examining a residence for sale in *561 preparation for an open house. Id. at 445, 625 A.2d 1110.
Here, the second motion judge distinguished Hopkins because no reported decision had extended that precedent to brokers to the extent that plaintiffs desired. The judge agreed with Prudential that this case was more akin to Rogers v. Bree, supra, 329 N.J.Super. at 199-200, 747 A.2d 299. The fact that Prudential had agreed to make emergency repairs in its contract with the Egners was not a distinguishing factor. The judge further was persuaded by the lack of contractual privity between Prudential and plaintiffs; that Prudential had received only a nominal fee from the rental agreement; and that it would be unjust in these circumstances to impose a duty to perform an inspection upon Prudential.
The Supreme Court's holding in Hopkins imposing liability upon brokers was clearly restricted to broker-sponsored open houses. The Court specifically noted: "Although we recognize that many variations of circumstances exist under which a broker can assist a customer in viewing a private residence, we deal here with the role and responsibility of a broker in conducting an open-house inspection of a residence," and that the broker is not a guarantor of the safe condition of the premises. Hopkins, supra, 132 N.J. at 439, 625 A.2d 1110. The Court further stressed that the broker's duty "does not replicate the more comprehensive duty owed by homeowners." Id. at 445, 625 A.2d 1110. "We do not expect that a broker, engaged in the marketing and sale of property, has the same intimate knowledge of the structural flaws or physical defects of a given home as the homeowners." Id. at 446, 625 A.2d 1110. These observations concerning the broker's limited role contrast with the much greater nexus to the property of the homeowners, here, the Egners.
It is also significant that the Supreme Court rejected our broader conclusion on intermediate review in Hopkins that a real estate broker has a duty to either warn customers through the placement of signs or to repair any physical defects that were reasonably discoverable. Id. at 443, 625 A.2d 1110. As the Court stated, "[w]e ... cannot agree that the imposition of such a broad duty of care comports with notions of fairness and sound public policy." Ibid.
No subsequent New Jersey case has extended Hopkins to impose tort duties upon real estate brokers beyond the specific "open house" scenario factually involved in that case. For example, in Rogers v. Bree, supra, 329 N.J.Super. at 199-200, 747 A.2d 299, a tenant claimed that a real estate broker had a duty to inspect premises for latent defects and, thus, was responsible for the injury that he suffered when he attempted to remove an improperly functioning washing machine. Under the terms of the lease, the defendant broker received a commission and had acted as property manager during the tenancy. Id. at 200, 747 A.2d 299. Those duties included collecting rent and acting as the contact agent for the landlord if repairs were needed. Ibid. In addition, the broker performed a walk-through of the premises to check the general condition of the townhouse. Ibid. The plaintiff conceded that there had been no discussion with the broker regarding the condition of the washing machine. Ibid.
In affirming the trial court's grant of summary judgment to the broker in Rogers v. Bree, we observed that given the "limited scope" of the broker's undertaking, "we fail to see how the public interest would be furthered by imposing a duty upon it to search every nook and cranny of the rental premises to discover latent defects." *562 Id. at 201, 747 A.2d 299. We noted that the broker "merely agreed to accept the rent on behalf of the owner, pay maintenance fees, and be the contact person for repairs." Id. at 201-02, 747 A.2d 299. This arrangement did not create a duty on the broker's part to "inspect the appliances, and pull them away from the wall to determine if they were operable, or if they contained hidden dangers." Id. at 202, 747 A.2d 299.
Here, Prudential undertook a similar "limited scope" of responsibility. It simply advertised the property, collected rent, and agreed in its contract with the Egners to make emergency repairs only. A modification of the wooden platform and the installation of handrails cannot be so classified as an "emergency repair." Under the existing state of the law, the situation here did not create a duty on the part of Prudential to "search every nook and cranny of the rental premises." Id. at 201, 747 A.2d 299.
Plaintiffs invoke N.J.A.C. 11:5-6.4(b), which requires, among other things, that "[e]very licensee shall make a reasonable effort to ascertain all material information concerning the physical condition of every property for which ... he or she is retained to market as a transaction broker." A "reasonable effort" is defined within that regulation as a "visual inspection of the property to determine if there are any readily observable physical conditions affecting the property." N.J.A.C. 11:5-6.4(b)(1)(ii).
As we have noted, Lynn Merkle stated that she did a "walk-through" of the house, which did not reveal what she would consider to be any "glaring" safety concerns. On the day of the Egners' closing, Hugh Merkle, who is Lynn's husband and also a realtor, conducted a similar walk-through with the Egners. Although these walk-throughs were not described by the witnesses as "inspections," they appear to satisfy the broker's regulatory obligations at the time of sale.
Plaintiffs contend that another regulation, N.J.A.C. 11:5-6.9, created a duty for Prudential to inspect the property. The regulation directs realtors to disclose "defects of a material nature affecting the physical condition of the property which a reasonable inspection by the licensee would disclose." N.J.A.C. 11:5-6.9(h). Significantly, this regulation does not apply to "short-term rentals," which are specifically defined therein as a rental for not more than 125 days, or a seasonal rental of the nature presented here. See N.J.A.C. 11:5-6.9(a)(6).
Unlike the case law principles associated with the Egners as lessors of the house, the tort liability of a real estate broker to persons injured on the premises that it is marketing has already been addressed by the Supreme Court, at least in part, in Hopkins. In addition, there is no comparable provision to Section 358 for lessors in the Second Restatement addressing brokers as a discrete class of defendants.
Although we appreciate that plaintiffs have raised several policy arguments[17] for why a broker should be liable in tort for failing to perform an adequate inspection of rental property, we decline the opportunity to so extend Hopkins. Instead, we reserve to the Supreme Court the prerogative to consider such an extension *563 of the common law relating to brokers beyond what it prescribed in Hopkins.
We therefore sustain the trial court's grant of summary judgment to Prudential.

IV.
Lastly, we briefly address defendants' cross-appeal on issues of proximate causation. Ordinarily, issues of proximate cause are considered jury questions. Beadling v. William Bowman Assocs., 355 N.J.Super. 70, 88, 809 A.2d 188 (App.Div.2002). However, in some instances courts have rejected causation arguments relating to acts that may have led to highly extraordinary consequences. Garrison v. Twp. of Middletown, 154 N.J. 282, 308, 712 A.2d 1101 (1998). We discern no such extraordinary consequences here.
The first motion judge correctly perceived genuine material issues of fact as to whether the alleged lack of conspicuity of the platform's drop in height and the absence of a handrail, once plaintiff had lost his balance, contributed to the ultimate injuries that plaintiff sustained. These two physical conditions are reasonably part of the "natural and continuing sequence" that led to plaintiff's fall. See Dawson v. Bunker Hill Plaza Assocs., 289 N.J.Super. 309, 322, 673 A.2d 847 (App. Div.), certif. denied, 146 N.J. 569, 683 A.2d 1164 (1996). Although the lack of a handrail cannot support liability here because of the lessee's admission of her awareness of that particular condition, the lack of conspicuity issue remains in the case.
Recognizing that plaintiff's command of the English language is at times poor and imprecise, his deposition answers can reasonably support a jury's determination that the unexpected change in elevation contributed to his ill-fated tumble to the ground. The fact that plaintiff cannot recall the exact manner in which he descended to the bottom of the stairs does not preclude fair inferences that the defect complained of was a proximate cause of his accident and his injuries.
We consequently reject defendants' cross-appeal and affirm the trial court's denial of summary judgment on the causation issues. Those issues are committed to the jury.

V.
Summary judgment as to Prudential is affirmed, but is vacated as to the Egners. The matter is remanded for trial solely as to the Egners, consistent with the liability principles we have expressed in this opinion. Defendants' cross-appeal is rejected.
NOTES
[1] The lease agreement does include a small photocopy of a picture of the front of the house. The photo does not show the rear deck where plaintiff fell.
[2] Mr. Egner recalled at his deposition, to the contrary, that he walked through the property in the spring of 2003 with a prospective tenant that he later identified as Colombia. We need not resolve this factual discrepancy for purposes of this appeal.
[3] Although Mrs. Reyes is a co-plaintiff by virtue of her per quod claim, we shall use the term "plaintiff" to refer singularly to Mr. Reyes.
[4] Plaintiff's exact age is not disclosed in the partial deposition transcripts supplied to us, although he did indicate at his deposition that he retired in 1991, twelve years before this accident, after working in industry for forty-one years. The transcript reflects that plaintiff, who has a second-grade formal education, exhibited difficulties in understanding and speaking English with precision.
[5] Plaintiff's deposition answers are ambiguous as to whether he was referring to a handrail that would have been reachable from atop the platform or, alternatively, a handrail on either side of the deck that he might have reached while descending from the deck to the ground below. For purposes of summary judgment, we view the ambiguity in a light most favorable to plaintiff.
[6] We recognize that proof of these repairs may be excluded at trial as subsequent remedial measures under N.J.R.E. 407, although we do not foreclose plaintiff from attempting to invoke some exception to that Evidence Rule to the trial judge. We mention the repairs only for sake of completeness, and also because they corroborate the Egners' control over the physical condition of the deck area.
[7] See John Templer, The Staircase: Studies of Hazards, Falls and Safer Design (MIT Press, 1992).
[8] Meade also cited the riser height between the platform and the stairway as being greater than 3/8ths of an inch, and therefore comprising a separate violation of the UCC. This particular theory of negligence is not raised in plaintiffs' appeal.
[9] This lengthy regulation is entitled "Obligations of [real estate] licensees to [the] public and to each other." N.J.A.C. 11:5-6.4.
[10] That judge, who we shall refer to as "the first motion judge," preceded the judge who heard all subsequent motions in the case, including Prudential's summary judgment motion in April 2007, and the Egners' summary judgment motion in May 2007. We shall refer to the latter jurist as "the second motion judge."
[11] Thereafter, the second motion judge granted Colombia's motion for summary judgment, dismissing all remaining claims against her in the third-party complaint. Again, that dismissal as to Colombia is not germane to the issues presented on this appeal.
[12] See, e.g., Kole v. AMFAC, Inc., 69 Haw. 530, 750 P.2d 929, 930 (1988) (holding that lessors had a duty to warn lessees of a known hazardous condition in the common areas of the condominium complex, specifically the risk of being struck by a golf ball); Zubrenic v. Dunes Valley Mobile Home Park, Inc., 797 N.E.2d 802 (Ind.App.2003), transfer denied, 812 N.E.2d 796 (Ind.2004) (holding that the injured guest of the lessee of a mobile home could maintain a cause of action against the mobile home lessor because material facts existed as to whether the stairway that caused the injury had also been used for the benefit of the lessor); Lewis v. Biegel, 204 S.W.3d 354, 360 (Mo.App. W.D.2006) (holding that where the owners of a building did not disclose a defective elevator braking system, which resulted in an injury to an employee of the lessee, a jury question was created as to whether the lessee-employer had a reasonable opportunity to discover and remedy the dangerous condition); Gonzalez v. Tounjian, 665 N.W.2d 705, 709-11 (N.D.2003) (holding that the appropriate inquiry where a tenant was injured by a metal fire door in a common area was whether the lessor had acted reasonably to discover dangerous conditions and to keep the common areas safe); Cowan v. One Hour Valet, Inc., 151 W.Va. 941, 157 S.E.2d 843, 849 (1967) (holding that an electrical inspector injured by a collapsing floor had a tort judgment properly entered in his favor against the lessors of the building because the lessors owed the inspector the duty of reasonable care since they knew or should have known of the dangerous condition of the floor).
[13] We recognize that the lease in Patton was nominally month-to-month, but the tenants there had remained in possession for four years.
[14] We suspect that Meade may have been referring to N.J.A.C. 5:10-7.7(a), which requires, among other things, that "[a]ll interior stairways having three or more risers, and all exterior steps having a drop of at least 24 inches to ground level or having at least four risers, shall have handrails which are to be securely fastened to walls or guard rails, and, unless continuous, shall be returned to the enclosure walls or posts at the end of the stairs." N.J.A.C. 5:10-7.7(a) (emphasis added). The Egners' deck has six risers.
[15] Here, given the short-term nature of the rental agreement, it is questionable whether Colombia had such a "reasonable opportunity to take effective precautions" concerning the deck hazards. This would be an issue for the jury to consider.
[16] In this respect, we tend to agree with the non-binding observations of the first motion judge concerning the potential visual hazard produced by the monochromatic coloration of the flooring.
[17] We reciprocally acknowledge the counter-arguments of policy raised by Prudential, including but not limited to the economic costs and delays that may result from imposing such a tort duty upon brokers, especially in a high-turnover context associated with a short-term vacation rental. We also doubt whether the broker, as opposed to the property-owner, is ordinarily in the better position to correct such hazards on the premises.