908 A.2d 837 (2006)
BERNADETTE GERINGER, Plaintiff-Appellant,
v.
HARTZ MOUNTAIN DEVELOPMENT CORPORATION, Defendant-Respondent.
No. A-1864-04T1
Superior Court of New Jersey, Appellate Division.
Argued September 13, 2006
Decided October 24, 2006
Before Judges Stern, Collester and Sabatino.
Michelle P. Camacho argued the cause for appellant (D'Alfonso & Camacho, attorneys; Ms. Camacho, on the brief).
Mary Beth Ehalt argued the cause for respondent (Weiner Lesniak, attorneys; Ms. Ehalt, of counsel and on the brief; James Hajel, on the brief).
The opinion of the court was delivered by
SABATINO, J.S.C. (temporarily assigned).
Plaintiff Bernadette Geringer was injured after falling on an interior stairway within an office building owned by defendant Hartz Mountain Development Corp. ("Hartz"). The incident occurred on a floor that Hartz leased in its entirety to plaintiff's employer, Metropolitan Life Insurance Company ("MetLife"). She thereafter filed a personal injury action against Hartz and other parties. Her claims against Hartz were essentially predicated on a theory that Hartz, as owner and lessor of the premises, had been negligent in the design, construction, maintenance and repair of the stairway located within its building. On September 8, 2004, the Law Division granted Hartz summary judgment, and plaintiff now appeals from that final order.
Although we affirm the Law Division's determination that Hartz, based upon the terms of its lease with MetLife and the surrounding circumstances, owed no duty to plaintiff regarding the maintenance and repair of the stairway in question, we reverse the Law Division's ruling that Hartz lacked any duty to plaintiff as to the stairway's design and construction. Accordingly, we remand this matter for trial as to whether Hartz breached those discrete obligations in a manner that proximately caused plaintiff's injuries.

I.
In January 2000 plaintiff was hired by MetLife as a sales representative. The following month, on February 26, 2000, plaintiff traveled from her home in Missouri to a MetLife regional training center on the seventh floor of an office building owned by Hartz and located at 500 Plaza Drive in Secaucus, New Jersey. Plaintiff had never been to that building before.
That morning, while plaintiff was walking back to her training room with a colleague after a short break, she tripped on carpeted interior stairs and fell on her head and left side. She apparently sustained substantial injuries from her fall, requiring surgeries on her lower left extremities and multiple hospitalizations. Plaintiff thereafter sued Hartz in the Law Division, also naming several other defendants that are no longer involved in the litigation. Additionally, plaintiff pursued a workers compensation claim against MetLife.[1]
As reflected by the testimony and photographs in the record, the stairway in question consisted of two steps, each about six inches high. The stairway led to a corner immediately adjacent to the top step, connecting to a raised portion of the seventh floor. The stairs were covered with a carpet that continuously extended from the floor area above the stairs to the area below the stairs, with no variation in color. No handrail was supplied. Two signs with red and white lettering, each ten inches by eight inches in size, were positioned on the walls next to the stairs, warning persons to "WATCH YOUR STEP."
MetLife built the stairway in connection with its modification of the seventh floor of the building, which previously had no elevated portion. MetLife hired its own architect and contractor to design and build the stairway. The plans and specifications were submitted to and approved by Hartz, through its vice-president of property management for the premises, Salvatore Gentile. As part of his review, Gentile performed a "walk-through" inspection of the work during its construction. MetLife also received building permits and certificates of occupancy for the stairway from the Hackensack Meadowlands Development Corporation (HMDC) and from the Town of Secaucus.
The lease between Hartz and MetLife contains a number of pertinent provisions. With respect to the preparation of the premises for MetLife's occupancy, Article 5 of the lease generally provides as follows:
Landlord [Hartz] shall deliver the Demised Premises to Tenant [MetLife] in "as is" condition. Tenant shall be responsible for all construction and work to prepare the Demised Premises for Tenant's occupancy at Tenant's cost and expense. Such construction shall be in accordance with Section 39.09 of this Lease.
[Lease, Section 5.01(b)(i)(emphasis added).]
Section 5.01(b)(i) goes on to detail the procedures for MetLife's "fit-up" of its portion of the premises:
Prior to performing any work in the Demised Premises, Tenant shall, within thirty (30) days of the date thereof[,] submit to Landlord for approval final plans and specifications for all construction work in the Demised Premises including, but not limited to layout, mechanical, electrical and plumbing plans and finish schedules ("Plans and Specifications"). Tenant shall employ licensed architect(s) and/or engineer(s) for the preparation of the Plans and Specifications. Landlord shall notify Tenant of Landlord's approval or disapproval of such Plans and Specifications. If Landlord disapproves, Landlord shall specify the reasons for disapproval and Tenant shall, within thirty (30) days of receipt of notice of Landlord's disapproval, resubmit revised Plans and Specifications that correct such items.
[Id. (emphasis added).]
The next provision, Section 5.01(b)(ii), obligates MetLife to obtain the necessary municipal approvals for the construction, and to assure that the work complied with all building codes:
Tenant shall obtain and provide all design and architectural services necessary to perform Tenant's Work and shall be responsible for complying with all building codes and Legal Requirements in connection with Tenant's Work, prior to commencing any work in the Demised Premises. Tenant shall obtain a permanent certificate of occupancy of the Demised Premises for the Permitted Uses. The construction of the Demised Premises shall be performed in a first class workmanlike manner.
[Id. at Section 5.01(b)(ii)(emphasis added).]
Pursuant to these contractual procedures, MetLife's agents submitted the plans and specifications for the stairway construction to Hartz, through its premises manager Gentile, and to the relevant construction code officials. Nothing in the record indicates that Gentile or any of the local code officials observed any deficiencies in the stairway's design or construction.
As to the allocation of contractual responsibility for the constructed portion of the premises, Section 5.01(b)(iii) of the lease attempts to shift that burden completely to MetLife as the tenant:
Tenant shall be solely responsible for the structural integrity of the improvements and for the adequacy or sufficiency of the Plans and Specifications and all the improvements depicted thereon or covered thereby, and Landlord's consent thereto, approval thereof, or incorporation therein of any of its recommendations shall in no way diminish Tenant's responsibility therefore or reduce or mitigate Tenant's liability in connection therewith. Landlord shall have no obligations or liabilities by reason of this Lease in connection[ ] with the performance of construction or of the finish, decorating or installation work performed by Tenant, or on its behalf, or in connection with the contracts for the performance thereof entered into by Tenant.
[Id. at Section 5.01(b)(iii)(emphasis added).]
Additionally, Article 17 of the lease demarcates the parties' respective contractual responsibilities for the repair and maintenance of MetLife's space:
17.01. Tenant shall, throughout the Term, take good care of the Demised Premises, the fixtures and appurtenances therein. Tenant shall be responsible for all repairs, interior and exterior, structural and nonstructural, ordinary and extraordinary, in and to the Demised Premises, and the Building (including the facilities and systems thereof) and the Common Areas the need for which arises out of (a) the performance or existence of the Tenant's Work or alterations, (b) the installation, use or operation of the Tenant's Property in the Demised Premises, (c) the moving of the Tenant's Property in or out of the Building, or (d) the act, omission, misuse or neglect of Tenant or any of its subtenants or its or their employees, agents, contractors or invitees. Tenant shall promptly repair or replace[,] as needed, all scratched, damaged or broken doors and glass in and about the Demised Premises and shall be responsible for all repairs, maintenance and replacement of wall and floor coverings in the Demised Premises and for the repair and maintenance of all sanitary and electrical fixtures and equipment therein. Tenant shall promptly make all repairs in or to the Demised Premises for which Tenant is responsible, and repairs, if any, required to be made by Tenant to or affecting the mechanical, electrical, sanitary, heating, ventilating, air-conditioning or other systems of the Building shall be performed only by contractor(s) approved by Landlord. Any other repairs in or to the Building and the facilities and systems thereof for which Tenant is responsible shall be performed by Landlord at Tenant's expense . . . [.]
17.02. So long as Tenant is not in default under this Lease beyond any applicable notice and cure periods, Landlord shall be responsible for all repairs and maintenance in and to the Building (including the facilities and systems thereof), except for those repairs and maintenance for which Tenant is responsible pursuant to any of the provisions of this Lease.
[Id. at Section 17.01 & 17.02 (emphasis added).]
Hartz invoked these various contractual provisions in support of its motion for summary judgment. It argued to the motion judge, as it does on this appeal, that MetLife was in exclusive control of the seventh floor of the building, and that MetLife was solely responsible under the lease for the design, construction, maintenance and repair of the stairway on that floor.
The motion judge agreed, finding no ambiguity in the lease and that it "clearly place[d] the responsibility for the construction of the [seventh-floor] premises upon the tenant, MetLife." The judge also noted that the lease made the tenant "responsible for repairs[,] both interior and exterior, structural and non-structural, ordinary and extraordinary," and that the lease "did not place an absolute duty upon the landlord to perform inspections upon the property and warn the tenant of any hazards." On the whole, the judge found that MetLife had "exclusive control over the premises and [the] particular instrumentality upon which the plaintiff fell." Based upon those findings, the judge granted summary judgment to Hartz, determining that Hartz owed no legal duty to plaintiff for any alleged defective condition of the stairway. Plaintiff moved for reconsideration, which the motion judge denied.
On appeal, plaintiff raises the following points:
POINT I
A DUTY SHOULD BE IMPOSED UPON A COMMERCIAL LANDLORD TO ITS INVITEE, TENANT'S EMPLOYEE, UNDER THE MODERN APPROACH AS ESPOUSED IN HOPKINS V. FOX & LAZO REALTORS, [132 N.J. 426 (1993)], ITS PROGENY, AND MONACO V. HARTZ MOUNTAIN CORPORATION, [178 N.J. 401 (2004)].
POINT II
THE LANDLORD IS LIABLE BECAUSE THE PUBLIC USE EXCEPTION TO THE GENERAL RULE OF NON-LIABILITY IS APPLICABLE.
POINT III
THE LANDLORD SHOULD BE HELD LIABLE BECAUSE THE UNDISCLOSED DANGEROUS CONDITIONS KNOWN TO LESSOR EXCEPTION TO THE GENERAL RULE OF NON-LIABILITY IS APPLICABLE.
POINT IV
THE LANDLORD HAD CONSTRUCTIVE NOTICE OF THE CONDITION OF THE STAIRS IN THE PREMISES LET TO METLIFE AND IS THEREFORE LIABLE UNDER § 358 OF THE RESTATEMENT (SECOND) OF TORTS FOR INJURIES SUSTAINED BY PLAINTIFF.
POINT V
BECAUSE THE DEFENDANT RESERVED SUCH CONTROL OF THE PREMISES AS WELL AS THE DEFECT AT ISSUE, DEFENDANT OWES A DUTY OF CARE TO PLAINTIFF.
POINT VI
UNDER THE LEASE TERMS, AN IMPLIED COVENANT TO REPAIR BY THE LESSOR EXISTS WHICH GIVES RISE TO A DUTY IN TORT.
POINT VII
THE [BOCA] CODE PROVIDES A STATUTORY BASIS WITHIN WHICH TO IMPOSE LIABILITY AGAINST THE LANDLORD.
POINT VIII
LANDLORD IS LIABLE FOR A NUISANCE HE PERMITTED, ASSISTED OR APPROVED ANOTHER TO CREATE.
POINT IX
LEASE PROVISIONS CANNOT ABSOLVE A LANDLORD FROM LIABILITY TO INNOCENT THIRD PARTIES.
POINT X
THE DEFENDANT'S RELIANCE UPON THE GOVERNMENTAL PERMITS AND CERTIFICATE OF OCCUPANCY IS MISPLACED, RECKLESS AND VIOLATIVE OF NEW JERSEY LAW.
POINT XI
SINCE THE DEFENDANT FAILED TO PLEAD THE AFFIRMATIVE DEFENSES OF UTILIZING THE LEASE PROVISIONS, LANDLORD OUT-OF-POSSESSION ARGUMENT AND RELIANCE UPON GOVERNMENTAL PERMITS AND CERTIFICATE OF OCCUPANCY, SAID DEFENSES ARE WAIVED UNDER OUR COURT RULES AND INTERPRETING PRECEDENT.
POINT XII
IF MONACO DOES NOT CONTROL AND NONE OF THE COMMON LAW EXCEPTIONS APPLY, THEN THIS COURT SHOULD HOLD A GENERAL TORT DUTY OF REASONABLE CARE BE IMPOSED UPON THE LESSOR.
Having fully considered those points and the competing arguments of Hartz, we conclude that the Law Division properly dismissed plaintiff's claims against the landlord for negligent repair and maintenance, but that it improvidently granted Hartz summary judgment with respect to plaintiff's claims of negligent design and construction.

III.
Under our State's current approach to premises liability, the legal duties of a defendant are not necessarily determined by examining traditional common-law classifications of injured persons as trespassers, invitees, licensees, and the like. Rather, the question of whether a duty is owed to a person injured on the premises and the extent of that duty, turns upon a multiplicity of factors, including a consideration of the relationship of the parties, the nature of the attendant risk, defendant's opportunity and ability to exercise reasonable care and the public interest in the proposed solution. Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993).
The specific context before us involves what is, in essence, a "triple net"[2] commercial lease, one in which MetLife obtained the exclusive use of the entire seventh floor of Hartz' building. As the owner of a building, Hartz would customarily owe duties of care to persons who are lawfully upon its premises to protect them from dangerous conditions. Brody v. Albert Lifson & Sons, Inc., 17 N.J. 383 (1955). However, through its lease arrangement with MetLife for the seventh floor, Hartz endeavored to delegate those responsibilities substantially.
We have no hesitation in affirming the motion judge's determination that Hartz, in light of the applicable lease provisions and the surrounding circumstances, owed no duty to maintain or repair the interior stairway within MetLife's leased space on the seventh floor in a safe condition. Article 17 of the lease confers that responsibility upon MetLife, as the stairway was indisputably a component of the demised premises for which MetLife assumed the duty to "take good care of." MetLife also agreed to undertake "all repairs" arising out of, among other things, "the performance or existence of the [t]enant's [w]ork or alterations." There is nothing in the record that suggests that, in actual practice, any employees of Hartz participated with MetLife in maintaining or repairing the stairway. On this score, we do not regard the deposition statements of Gentile and of Hartz' property manager Karen Ronchetta, acknowledging hypothetically that he or she might alert MetLife personnel upon noticing a loose handrail, a hole in the floor or some other similar problem while walking through the seventh floor, as sufficient to confer an ongoing duty upon Hartz to inspect, maintain or repair the stairway.
Our analysis of this issue is consistent with McBride v. Port Authority of New York and New Jersey, 295 N.J. Super. 521 (App. Div. 1996), in which we held that "there is no landlord liability" for personal injuries suffered by a commercial tenant's employee on the leased premises "due to a lack of proper maintenance or repair, when the lease unquestionably places responsibility for such maintenance or repair solely upon the tenant." Id. at 522. The plaintiff in McBride was injured when a vehicle he was operating at a loading dock on premises leased by his employer struck a hole in the dock, which caused his vehicle to lurch and toss him to the ground. As in the present case, the lease in McBride unambiguously placed upon the tenant exclusive responsibility for maintenance and repair of the area where the plaintiff fell. We also held that a commercial landlord's reservation of a right to re-enter the premises to perform repairs does not suffice as a matter of law to make the landlord liable for the unrepaired condition of the leased premises. Id. at 525. See also Faber v. Creswick, 31 N.J. 234 (1959).
Moreover, in light of the undisputed nature of the record germane to the maintenance and repair of the stairway, such a result comports with the factors identified in Hopkins. Plaintiff does not offer any proof that Hartz supervised MetLife's maintenance of the stairway, or that its own personnel were routinely involved in such activities. Nor is there evidence that Hartz had any reason to believe that MetLife or its maintenance workers would be careless in the stairway's upkeep.
Given the rather comprehensive nature of MetLife's use and occupancy of the seventh floor, as well as the carefully defined roles of the parties concerning repairs and maintenance expressed in their lease, we discern no "public interest" or other compelling reason to impose upon Hartz a duty to assure to third parties such as plaintiff that MetLife would carry out its obligation to keep the stairway in a safe condition. Nor is the "attendant risk" of a sort that warrants the imposition of such a duty. Additionally, Hartz's "opportunity and ability to exercise reasonable care" as to the stairway's condition after its construction and MetLife's subsequent continuous occupancy of the seventh floor was, at best, limited. See Hopkins, supra, at 439.
We reach a different conclusion, however, as to plaintiff's separate allegation that the stairway was defectively designed and built in the first place. Unlike the lease provisions in Article 17 regarding maintenance and repair, Article 5 of the lease injects Hartz quite substantially in the design and construction of the leased space. No construction of the fit-up could proceed without Hartz first reviewing and approving MetLife's plans and specifications. Hartz was empowered to reject those plans if it was dissatisfied, and to demand that the plans be revised and resubmitted. In addition, Hartz's representative Gentile encouraged MetLife to use several of Hartz's in-house subcontractors, including electricians, plumbers and other specialty trades. Thus, Hartz played an essential part in the design and construction process.
Although Section 5.01(b)(iii) of the lease does recite that such approval by Hartz would not "diminish [the] [t]enant's responsibility" for the construction and design work, and that Hartz "shall have no obligations or liabilities by reason of this [l]ease" in connection with that work, those attempted disclaimers should not absolve Hartz of a duty under tort law to assure that its own conduct, in reviewing MetLife's plans and specifications, reasonably adhered to sound principles of safety. Indeed, the "by reason of this [l]ease" phraseology in Section 5.01(b)(iii) implicitly recognizes that the private contract terms between Hartz and MetLife would not necessarily insulate either one of them from liability under common-law tort principles for an unsafe stairway design that would endanger persons coming onto the premises. Nor do the construction permits and certificates of occupancy issued by Secaucus and the HMDC for the premises foreclose the potential liability of the landlord and tenant under the common law of negligence. Honigfeld v. Byrnes, 14 N.J. 600, 608 (1954); Fiduccia v. Summit Hill Const. Co. Constr., 109 N.J. Super. 249 (Cty. Ct. 1970).
Beyond the bare text of the lease, the record before us also indicates that Hartz did in fact exercise its prerogatives in reviewing the construction plans for the seventh floor, inspecting the space during construction and communicating its input to MetLife's representatives. For example, Gentile euphemistically noted at his deposition that Hartz did some "coordinating" with MetLife on the build-out of the seventh floor, citing as an example MetLife's use of Hartz' fire alarm subcontractor to tie in the space to the building's overall fire alarm system. Hartz attempts to characterize that involvement as confined to assuring that the seventh-floor construction was compatible with building systems. However, the lease does not so limit the landlord's scope of review, and had the parties intended to agree to such a limitation they easily could have expressed it in their detailed written agreement. In sum, the surrounding circumstances suggest that Hartz kept its hand in the design and construction phase of the project, thereby providing it with both the "opportunity and ability to exercise reasonable care" in how the stairway in question was built. Hopkins, supra, at 439.
Our recognition of a duty of care in the design and construction of the stairway under these particular circumstances is consistent, if not factually synonymous, with the Supreme Court's analysis in Monaco v. Hartz Mt. Corp., 178 N.J. 401 (2004). In Monaco the Court held that defendant Hartz, there in its capacity as a commercial landowner with a public sidewalk, owed certain duties to safeguard pedestrians from the hazards posed by a loose municipal parking sign installed on that sidewalk by the City of Newark. Although the Court recognized that, under the pertinent local ordinances, Hartz had no right to repair the sign, as a commercial landowner it still had the obligation to notify the city of obvious defects with the sign and to warn pedestrians who might be struck by the sign on a windy day. Id. at 413-18. The Court based its holding upon the various factors set forth in Hopkins, including considerations of public policy. Ibid.
Here, we do not conceive that public policy requires Hartz to have had an ongoing duty to perform inspections of the seventh floor stairway during MetLife's use and occupancy of the premises. Such continuing post-construction inspections would be in the nature of maintenance and repair functions that the lease fairly delegated to MetLife. However, we are persuaded that Hartz was obligated to have acted reasonably in reviewing the plans and specifications for the stairway before it was built, and in the "walk through" inspections that it chose to perform before the floor was occupied. Such temporally-circumscribed duties are harmonious with the landlord-tenant relationship of these particular parties and also with general considerations of premises liability set forth in Hopkins.
For these reasons, we conclude that the Law Division's summary judgment order must be reversed in part, and that the matter should be remanded for trial on the limited issue of whether Hartz breached its duty[3] to exercise reasonable care in assuring the safe design and construction of the stairway on which plaintiff suffered her injury. From our review of the photographs and the associated deposition testimony concerning the stairway, as well as the report of plaintiff's liability expert criticizing the design and construction of the stairway, we perceive there are genuine issues of material fact on that question. Among other things, there are fact questions as to the visual prominence of the elevation change on the stairs which have the same color as the floor on both ends, the adequacy of the two warning signs, and the absence of a handrail. We do not address other issues in the case, such as plaintiff's potential comparative fault and the proximate causation of her injuries, which shall be developed at trial. We also find it unnecessary to comment upon the other issues set forth in the parties' briefs, except to note that they lack sufficient merit to alter our analysis. R. 2:11-3(e)(1)(E).
Affirmed in part, reversed in part, and remanded.
NOTES
[1] During the course of the litigation Hartz impleaded MetLife as a third-party defendant, but subsequently Hartz and MetLife entered into a stipulation of dismissal, amicably adjusting their differences on undisclosed terms. The outcome of plaintiff's workers compensation case is not known to us and is irrelevant to our review of this appeal.
[2] A "triple net" or "net-net-net" lease is a lease in which a commercial tenant is responsible for "maintaining the premises and for paying all utilities, taxes and other charges associated with the property." N.J. Indus. Properties v. Y.C. & V.L., Inc., 100 N.J. 432, 434 (1985). Although we have not been furnished in the record with the entire Hartz-MetLife lease, counsel represented to us at oral argument that the lease is a triple net lease.
[3] At oral argument before us, defense counsel acknowledged that if we were to reverse summary judgment in this case and determine that Hartz owed a duty to plaintiff, the trial judge on remand should fashion a jury charge adapted from the model charge for premises liability cases involving business invitees. See Model Jury Charges (Civil) 5.24B(5). We agree with that notion, except we instruct that the charge, consistent with this opinion, should make clear that Hartz was not liable to conduct periodic inspections of the stairway after its design and construction had been completed and MetLife had assumed occupancy.