**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3129-23

VASWANI INC.,

    Plaintiff-Respondent,

v.

YX1 LOGISTICS, LLC,

    Defendant-Appellant.

_____

Submitted February 4, 2025 – Decided March 6, 2025

Before Judges Sumners and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-2575-21.

Clark Guldin Attorneys at Law, attorneys for appellant (Jonathan A. Ozarow, of counsel and on the briefs).

The Law Offices of Bruce E. Baldinger, LLC and Robert A. Jones, attorneys for respondent (Bruce E. Baldinger and Robert A. Jones, on the brief).

PER CURIAM

In this commercial lease matter, defendant YX1 Logistics, LLC appeals from a March 27, 2024 Law Division amended final judgment, which was entered in favor of plaintiff Vaswani, Inc., and dismissed defendant's counterclaims following a bench trial. Defendant further appeals from the June 7, 2024 trial court order granting plaintiff's motion for reconsideration and awarding $364,469.46 in damages, including $139,439.85 in damages and $225,029.61 in counsel fees to plaintiff. Following our review of the parties' arguments, the record, and the applicable law, we affirm in part, reverse in part, and remand for further proceedings.

I.

We summarize the evidence adduced during the six-day bench trial as necessary to resolve the issues raised on appeal. On July 1, 2018, 207 Pond Middlesex Property, LLC (207 Pond) entered a triple net[1] lease (master lease) with defendant. Defendant rented 255,000 square feet of commercial office and warehouse space in Middlesex from 207 Pond. Under provision 12.1 of the

_____

[1] "A 'triple net' . . . lease is a lease in which a commercial tenant is responsible for 'maintaining the premises and for paying all utilities, taxes and other charges associated with the property.'" Geringer v. Hartz Mountain Dev. Corp., 388 N.J. Super. 392, 400 n.2 (App. Div. 2006) (quoting N.J. Indus. Props. v. Y.C. & V.L., Inc., 100 N.J. 432, 434 (1985)).

master lease, defendant was "solely responsible for obtaining all certificates and permits to legally use the [l]eased [p]remises" and was "solely responsible for the installation of any and all systems required by any City, State[,] or municipal authority or ordinance(s) for the conduct of its business including but not limited to any . . . sprinkler system, fire suppression, alarm or exhaust system."

On October 20, 2020, defendant entered a sublease with plaintiff for 37,025 square feet of warehouse and office space (the subleased property) at the Middlesex property (the building). Plaintiff entered the sublease for the purpose of assembling and storing custom retail fixtures that it manufactured, designed, and installed for businesses throughout the country. Plaintiff's Chief Financial Officer Amit Nihalani executed the sublease with defendant's principal Victor Kameo. The sublease commenced on October 15, 2020, and terminated on September 30, 2021, with no renewal option. Under the sublease, plaintiff's monthly rent was $32,396.85, and it paid a security deposit of two months' rent.

Under provision five of the sublease, plaintiff was only required to pay the base monthly rent and no "additional expenses." The provision further stated defendant "was obligated to maintain . . . all major systems such as the heating, plumbing, and electrical." Article four of the sublease's seventeenth provision addressed the condition of the premises, stating:

The [l]essee has had the opportunity to inspect the [p]remises and acknowledges with its signature on this lease that the [p]remises are in good condition and comply in all respects with the requirements of this [l]ease. Furthermore, the [l]essor makes no representation or warranty with respect to the condition of the [p]remises or its fitness or availability for any particular use, and the [l]essor shall not be liable for any latent or patent defect therein. Furthermore, the [l]essee represents that [l]essee has inspected the [p]remises and is leasing and will take possession of the [p]remises with all current fixtures present in their "as is" condition as of the date hereof.

After plaintiff took possession in October 2020, it planned deliveries and moved inventory to the subleased property. On November 12, about a month after plaintiff's lease commenced, the Middlesex County Fire Marshal's Office (MCFMO) issued defendant Uniform Fire Code (UFC)[2] violations for the building. When inspecting the building, an assistant fire marshal found ten UFC violations, including seven related to the adequacy, maintenance, and performance of the "[f]ire protection [s]ystem" and three violations related to the obstructed means of egress and storage of combustible materials. He issued a notice of imminent hazard and an order to take corrective action, which forced

---

[2] N.J.A.C. 5:70-1 to -4.20. The UFC was promulgated pursuant to the New Jersey Uniform Fire Safety Act, N.J.S.A. 52:27D-192 to -213.

A-3129-23

the building's closure as of 5:00 p.m. on November 12 and prohibited any use and occupancy.

The assistant fire marshal advised other MCFMO employees in an email dated November 12 that the fire protection system at the building was inadequate, and the building was on a "fire watch . . . until the [f]ire [a]larm and [s]prinkler [s]ystem[s] [we]re repaired, tested, and compliant with the type of storage." In a later email sent to the Borough of Middlesex's construction official, the assistant fire marshal stated that the "hazard [was] due to problems with the [fire] alarm system and sprinkler system. The [b]uilding [would be] on a fire watch until repairs c[ould] be made. The[re] [was] also [UFC] code violations in the building for improper storage and blocked egress."

The subleased property's extended closure for almost five months for UFC violations resulted in this commercial lease dispute. On May 3, 2021, plaintiff filed an amended complaint asserting claims for: breach of contract; breach of the warranty of quiet enjoyment and use; Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -228, violations; and defendant's counsel's negligent and intentional misrepresentation. After defendant successfully moved to dismiss the CFA and misrepresentation claims, it filed an answer and counterclaim. Defendant's

counterclaim alleged:  breach of contract; promissory estoppel; unjust enrichment; and frivolous litigation.  On August 13, plaintiff filed an answer.

At trial, Nihalani testified plaintiff suffered harm because it could not use the subleased property and remove its merchandise.  He explained that defendant failed to advise plaintiff on November 12, 2020, that the MCFMO ordered the building closed.  During a phone call on December 2, the assistant fire marshal told Nihalani that plaintiff's employees had to vacate the subleased property due to the building's closure for UFC violations.  Nihalani immediately contacted Kameo regarding the subleased property's closure and advised Kameo that the closure was going to cause "severe disruption [to plaintiff's] business."  He testified plaintiff had to locate "alternative space" "for the goods that were coming" in because they could no longer be delivered, stored, and assembled at the subleased property.  Further, Nihalani emailed Kameo explaining that because there were "four containers [of goods] that [plaintiff] c[ould not] unload," plaintiff was going to be billed "$650 per day, per container in demurrage charges."  While Nihalani had inspected the subleased property for plaintiff prior to entering the sublease, he acknowledged not investigating the fire alarm and sprinkler systems.

A-3129-23

On December 8, Nihalani emailed Kameo to confirm that plaintiff would "be back in the warehouse by . . . December 10." On December 10, the assistant fire marshal still had not lifted the closure order or permitted plaintiff into the subleased property. That day, Nihalani emailed Kameo and offered to forward the invoices for the resulting expenses plaintiff was incurring. He also requested they come to an arrangement on whether plaintiff would "be reimbursed for the rent, demurrage charges, freight, and labor expenses." Kameo advised Nihalani that he would address the situation once the MCFMO rescinded the notice of imminent hazard and permitted plaintiff back into the subleased property.

Nihalani testified he understood from his conversations with Kameo that defendant was waiving plaintiff's rent obligation under the lease for the time that "full access to the [subleased] [p]roperty" was denied. He stated that in mid-February, Kameo offered plaintiff the option to move out. Specifically, Nihalani testified that Kameo "[t]wice . . . told [plaintiff] just to leave," but plaintiff remained based on Kameo's assurances that the building would be fixed "in a timely manner." While the subleased property remained closed, plaintiff diverted shipments elsewhere and was forced to store materials in other locations. Plaintiff used alternate warehouse space to continue its business

7

operations. On March 29, 2021, the assistant fire marshal provided plaintiff with a one-time exception to remove inventory.

On April 12, after approximately five months, the fire alarm and sprinkler systems were repaired, and the assistant fire marshal advised Nihalani the notice of imminent hazard was rescinded. The same day, defendant's counsel sent plaintiff a notice of default for plaintiff's failure to pay rent, alleging $161,984.25 in back rent and threatening eviction. In response, plaintiff's counsel notified defendant that there had been an agreement that defendant would charge no rent until the parties addressed the subleased property's closure and plaintiff's damages "in excess of $300,000." Nihalani separately emailed Kameo a proposed resolution, which Kameo did not accept. The two men later met on April 20 but failed to reach a resolution.

On April 14, plaintiff began renting another comparable office space at a higher monthly rent of $35,333.33. On April 20, Nihalani learned the subleased property did not have a certificate of occupancy (CO). Plaintiff decided it would vacate the subleased property based on the long-term closure and further questions surrounding the building. In May, plaintiff learned defendant was facing eviction for failing to pay rent under the master lease, which Nihalani believed placed plaintiff's sublease in jeopardy. Nihalani believed he could not

8

operate as normal from the property without a CO, and Kameo did not obtain a CO until May 25. Plaintiff vacated the subleased property on June 1 and placed $194,000 in rental monies accrued under the sublease into escrow.

Nihalani testified that due to the subleased property closure, plaintiff sustained damages of: $17,618.88 for the "incremental costs of the additional warehouse"; $64,793.70 for the security deposit; $55,420 for storing "inventory . . . intended to be stored at" the subleased property but diverted to third parties; $14,590.75 for the cost of sending "inventory. . . brought in[to other storage facilities], subsequent to" the subleased property's closure; and $111,741.06 in lost profits because plaintiff had to store the incoming inventory meant for the subleased property at its Edison facility, which resulted in the inability to store customers' materials at the Edison facility. Nihalani explained that he calculated the $111,741.06 in lost profits by determining the space used in the Edison facility that would typically have stored customers' items and then applying a "[fifty] cent per square foot cubic charge" to that space.

On cross-examination, Nihalani testified he calculated the alleged amount of damages by using relevant data "in . . . [plaintiff's] ERP system." This calculation used the square footage plaintiff was forced to use at the Edison facility for the subleased property's diverted goods. He used the stored items

9

size and dimensions.  He also recalled "a situation where . . . [plaintiff] did[ not] have the ability to service customers" by storing products, but he could not recall specific details.  Nihalani conceded plaintiff did not "actively" market the Edison facility space because plaintiff realized it could not "take on more customers."  At his deposition, Nihalani addressed plaintiff's alleged damages, but the parties disputed whether plaintiff had failed to respond to defendant's discovery requests for documentation of the lost profits.

The construction official testified that he was responsible for performing building inspections in Middlesex.  He recalled that in May 2020, he received defendant's application for a CO, but he could not recall the applicant's name.  The official inspected the building but did not issue a CO "due to" insufficient "fire alarm and sprinkler system[s]."  The official explained that no CO was issued for the building until the following year on May 25, 2021.

The assistant fire marshal who inspected the building testified that all buildings are required to have UFC certificates of inspection at a property's location.  He further stated that certificates are generally issued to the entity occupying the building.  The assistant fire marshal had previously inspected the building in 2019, finding "[t]here w[ere] [UFC] violations."  In 2019, the assistant fire marshal discovered there were "[f]ire alarm issues, sprinkler

issues," and other concerns. He testified the building's owner, defendant, or entity in possession of the building should have addressed the UFC violations during the abatement period. "[D]ue to [his] workload," the assistant fire marshal did not reinspect the building until November 12, 2020, which resulted in the issuance of a notice of imminent hazard and closure of the entire building. On February 17, 2021, the assistant fire marshal granted defendant's request for an extension to cure the violations. He thereafter granted defendant's request for a further extension until April 15. The assistant fire marshal confirmed that on April 12, he rescinded the notice of imminent hazard and "fire watch."

On April 20, after a walk-through inspection, the assistant fire marshal issued new "violation notices" related to "fire extinguishers," "[c]arbon monoxide detectors," and "maintain[ing] fire rated construction in another area." He testified that "the fire alarm control panel" was not located in plaintiff's subleased space, and there were "sprinkler system controls . . . all over the building."

During the trial, defendant called plaintiff's Chief Executive Officer Vinay Vaswani (CEO) to testify. He confirmed that Nihalani's calculated damages for the "storage [loss] claim" of $111,740.06 were based on lost rental "space within [plaintiff's Edison] warehouse[,] and it reflect[ed] the lost potential revenue or

11

sales [for] having to take up that space at [the] warehouse." The CEO had no knowledge of defendant's discovery requests for "documents related to [its] temporary storage [damage] claim." Regarding plaintiff's invoices for shipping charges and other damages, the CEO testified to being unfamiliar with the invoices as his primary focus was sales and "less so on the operations." He further testified that "Nihalani [wa]s in charge of most of the interactions" regarding the subleased property, storage, and shipments. The CEO knew Nihalani "explore[d] alternative space and . . . tr[ied] to figure out how to manage" the closure issue because plaintiff did not "have access to" the subleased property, creating an urgent "challenge."

Kameo testified that the MCFMO never notified him of UFC violations in 2019. He recalled applying for a CO in 2020, but he admitted to only receiving a CO on May 25, 2021. He maintained the UFC violations were issued directly to defendant's subleasing tenant Tri State. Kameo acknowledged the violations related to necessary fire alarm and sprinkler system repairs in addition to the storage of flammable products. He stated defendant had the initial obligation to cure the violations but was steadfast in his testimony that the "obligations were pushed to the . . . . sublease tenant[s]."

Kameo stated that Wynn Global Logistics (Wynn) contacted him after the closure, claiming ownership of the concerning flammable products located in Tri State's subleased space. After Wynn had agreed to remove the products but failed to act, on February 3, 2021, defendant filed an order to show cause and verified complaint seeking temporary restraints to seek removal of the flammable products. On March 12, the motion court issued an order requiring Tri State and Wynn to remove the inventory within thirty days of when the MCFMO permitted entry into the building. Wynn thereafter removed the products. Kameo testified that defendant sued Tri State and Wynn and obtained a judgment against Tri State "somewhere [around] $2,000,000."

Kameo further testified that plaintiff always "had access" to its subleased property and was never prevented from "tak[ing] things out." Kameo maintained on cross-examination that the MCFMO order closing the building was only issued to Tri State. Kameo asserted that there was never a rent abatement agreement, and Nihalani "never said . . . he [did not] want to pay rent" after the assistant fire marshal issued the notice of imminent hazard.

Regarding the repairs and responsibility to cure the fire alarm and sprinkler system violations, Kameo testified the violations were the subtenant's responsibility, and plaintiff was responsible for its "section" of the building. He

13

conceded he never contacted plaintiff to request any fire alarm and sprinkler system repairs or financial contribution for repairs. Kameo admitted to offering plaintiff a release from the sublease but qualified it was subject to the negotiation of its rental obligation.

At the conclusion of the trial, the court reserved decision. In its oral decision that followed, the court found "the actions of . . . defendant constituted a breach of contract and [a] breach of the covenant of good faith and fair dealing." Specifically, it determined plaintiff established defendant breached the sublease because: the master lease "identifie[d] that the sprinkler systems and fire alarm systems were defendant's responsibility and not the [sub]tenant's responsibility"; defendant was required under the sublease to "maintain . . . the premises in addition to all major systems, such as the heating, plumbing, and electrical," which included the "fire alarm[s] and the sprinklers"; "the failing sprinkler and [fire] alarm systems were not maintained and resulted in a shutdown of the building directly and negatively impacting plaintiff's ability to conduct its business"; "during the . . . shut[down]," plaintiff could not deliver "products of any kind . . . into the facility and no . . . work could be conducted . . . , which was at the very heart of the business model plaintiff had for use of this [subleased] property"; and "plaintiff had to make alternate

arrangements . . . [for] goods[] with other facilities to cover their business."  The court concluded plaintiff sufficiently established damages, finding "plaintiff simply did not get the benefit of what [it] bargained for, although [it] intended and" tried to comply with the sublease terms.

After finding the construction official testified credibly, the court found he established defendant never obtained a CO in 2020 because "there w[ere] no [working] fire alarm or sprinkler" systems as required.  It also found the assistant fire marshal's testimony was "credible" and "essential."  The assistant fire marshal established that unabated fire alarm and sprinkler system violations existed in 2019.  The court noted the UFC violations existed when plaintiff took possession of the building, and "[t]he building . . . did not have a valid New Jersey [c]ertificate of [i]nspection, even though every property was required to have one pursuant to the [UFC]."  It observed buildings may have multiple certificates of inspection.  The court found it relevant that there was "one singular [fire alarm system and sprinkler] system for the entire building," and the assistant fire marshal established the notice of imminent hazard "meant the entire building was shut down."  While the November 12 MCFMO order was issued to Tri State, the assistant fire marshal had contemporaneously contacted Kameo to discuss the violations and sent defendant a "list of identical violations

. . . issued." The court also found the assistant fire marshal established that "Kameo acknowledged it was [defendant's] responsibility to take care of the repairs and that [it] . . . hired the people to do so."

The court found most of Kameo's testimony was not credible but did not "discount his testimony in its entirety." The court stated that "his testimony often contradicted itself or contradicted prior deposition testimony, despite his attempts to explain or rationalize inconsistencies that the [c]ourt d[id] not find credible." It noted that while Kameo could not recall a discussion about forgiving plaintiff's rent, defendant produced no invoices or documents requesting rent after January 2021. Specifically, the court found Kameo's testimony regarding the lack of a CO was not credible, because he admitted to applying for a CO in early 2020 yet never received a CO before entering the sublease with plaintiff. Further, the court stated Kameo was clearly "aware of the issues related to the fire alarm and the sprinkler system[s] prior to entering into the sublease" with plaintiff.

Regarding damages "attributable to the breach by . . . defendant," the court awarded "$74,646.15," finding: "the amount of $14,000 for temporary storage," because invoices showed "for April . . . 2021" "warehousing in the amount of $7,000 and [for] May 2021 in the amount of $7,000"; "the amount of $5,565.25"

16

for replacement warehouse storage with Ace Worldwide; and "$55,008.90" for the loss of space in the Edison facility because plaintiff "could have used it for other needs."[3]  Additionally, the court ordered defendant to return plaintiff's "security deposit in the amount of $64,793.70" and found plaintiff was "entitled to attorney's fees."

On May 6, 2024, the court awarded plaintiff counsel fees.[4]  Thereafter, plaintiff successfully moved for reconsideration of the amount of counsel fees awarded.  In granting the motion, the court referenced its prior oral decision and found it had "only intended to reduce [plaintiff trial counsel's] bill by 15.1 hours.  However, it erroneously subtracted this amount from 54.3 hours, as evidenced

---

[3]  We note the sum of the court's awarded damages to plaintiff for costs incurred and lost profits appears to total $74,574.15.  It is unclear from the record how the court derived the $74,646.15 total.

[4]  On appeal, we were not provided the transcript of the court's May 6, 2024 oral decision awarding counsel fees.  We note defendant contends the court erroneously found plaintiff was entitled to counsel fees under the sublease, but defendant does not challenge the amount of awarded counsel fees.  Therefore, we limit our discussion to the arguments defendant raised on appeal.  Issues not briefed on appeal are deemed waived.  Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2025); In re Gloria T. Mann Revocable Tr., 468 N.J. Super. 160, 180 (App. Div. 2021); Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) (finding "[a]n issue not briefed on appeal is deemed" abandoned).

by the transcript." The court elucidated that the calculation error warranted reconsideration because:

> 15.1 hours should have been reduced from the total of 260.75 hours billed to 245.65 hours billed. At $550 an hour this would amount to $135,107.50. The total for [plaintiff co-counsel's] bill ($135,107.50), [plaintiff's counsel]'s bill ($85,935) and the costs and fees ($2,531.11 and $456) is . . . $225,029.61.

On appeal, defendant argues reversal is warranted because the court erroneously: determined defendant breached the sublease; calculated damages; and failed to enter judgment in favor of defendant awarding damages for rent owed from April 12, 2021, through June 30, 2021, plus attorneys' fees.

II.

We begin by recognizing the well-established standard of review of an appeal from a bench trial. We "review a 'trial court's determinations, premised on the testimony of witnesses and written evidence at a bench trial, in accordance with a deferential standard.'" Nelson v. Elizabeth Bd. of Educ., 466 N.J. Super. 325, 336 (App. Div. 2021) (quoting D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013)). Ordinarily, "[t]he scope of [our] review of a trial court's fact-finding function is limited." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting Cesare v. Cesare, 154 N.J. 394, 411 (1998)). "[W]e defer to the trial court's credibility determinations, because it '"hears the

18

case, sees and observes the witnesses, and hears them testify," affording it "a better perspective than a reviewing court in evaluating the veracity of a witness."'" City Council of Orange Twp. v. Edwards, 455 N.J. Super. 261, 272 (App. Div. 2018) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)).  We will "'not disturb the factual findings and legal conclusions of the trial judge' unless convinced that those findings and conclusions were 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'"  Allstate Ins. Co. v. Northfield Med. Ctr., P.C., 228 N.J. 596, 619 (2017) (quoting Griepenburg v. Township of Ocean, 220 N.J. 239, 254 (2015)).

## III.

## A.

Defendant first contends the court erred in determining it breached the sublease with plaintiff.  Specifically, defendant argues the court erroneously determined it "breached an express provision of the [s]ublease," and plaintiff was prevented from using the subleased space.  We disagree.  The record supports the court's findings regarding defendant's breach, which it based on the sublease's plain language and credibility determinations.

A-3129-23

A "lease is a contract . . . which sets forth [the parties'] rights and obligations to each other in connection with [a] temporary grant of possession of [one party's] property to [the other party]." Town of Kearny v. Disc. City of Old Bridge, Inc., 205 N.J. 386, 411 (2011). "It is well-settled that '[c]ourts enforce contracts "based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract."'" Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 615-16 (2020) (alteration in original) (quoting In re County of Atlantic, 230 N.J. 237, 254 (2017)). "The court's role is to consider the agreement's terms 'in the context of the circumstances under which it was written,' 'accord to the language a rational meaning in keeping with the expressed general purpose[,]' and apply the agreement accordingly." Accounteks.Net, Inc. v. CKR Law, LLP, 475 N.J. Super. 493, 504 (App. Div. 2023) (alteration in original) (quoting Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 269 (2006)). "The plain language of the contract is the cornerstone of the interpretive inquiry; 'when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result.'" Barila, 241 N.J. at 616 (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)). "We do not supply terms to contracts that are plain and unambiguous, nor do we make

a better contract for either of the parties than the one which the parties themselves have created." Barr v. Barr, 418 N.J. Super. 18, 31-32 (App. Div. 2011) (quoting Maglies v. Est. of Guy, 193 N.J. 108, 143 (2007)). "The interpretation of a contract is generally subject to de novo review." Arbus, Maybruch & Goode, LLC v. Cogen, 475 N.J. Super. 509, 515 (App. Div. 2023).

Further, "[e]very party to a contract . . . is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract." Wood v. N.J. Mfrs. Ins. Co., 206 N.J. 562, 578 (2011) (quoting Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 224 (2005)). "The covenant of good faith and fair dealing calls for parties to a contract to refrain from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive' the benefits of the contract." Brunswick Hills, 182 N.J. at 224-25 (quoting Palisades Props., Inc. v. Brunetti, 44 N.J. 117, 130 (1965)). "Although the implied covenant of good faith and fair dealing cannot override an express term in a contract, a party's performance under a contract may breach that implied covenant even though that performance does not violate a pertinent express term." Wade v. Kessler Inst., 172 N.J. 327, 341 (2002) (quoting Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001)).

At the outset, we recognize that under the master lease, defendant was "solely responsible for the installation" of any "sprinkler system, fire suppression, alarm or exhaust system." Further, provision five of the sublease stated that defendant "was obligated to maintain . . . all major systems such as the heating, plumbing, and electrical." The court correctly determined the sublease's plain language required defendant to maintain the fire alarm and sprinkler systems for subtenants, as they were major systems. Therefore, the sublease, which comported with the master lease, bound defendant to ensure that the building had operable fire alarm and sprinkler systems for plaintiff's subleased property.

On November 12, 2020, after the assistant fire marshal found numerous UFC violations that presented an imminent hazard, he ordered the entire building closed, precluding plaintiff from using its subleased property. The court found the assistant fire marshal credibly testified that both the fire alarm and sprinkler systems were "one singular system for the entire building." Plaintiff had no ability to control or address the inoperable systems from its subleased property. As the court found, defendant knew the fire alarm and sprinkler systems were inoperable given that the construction official did not grant Kameo's CO application in early 2020 due to the insufficient "fire alarm

22

and sprinkler system[s] . . . in the building." The record amply supports the court's finding that defendant knowingly failed to maintain operable fire alarm and sprinkler systems, which was a breach of the sublease resulting in plaintiff's total inability to use the subleased property.

The record also supports the court's finding that after the MCFMO issued the notice of imminent hazard, the entire building was closed from November 12, 2020, through April 12, 2021. This closure prohibited plaintiff from entering and using the subleased property for its intended purpose for approximately five months. Additionally, the CO was not issued until May 25, 2021. Plaintiff vacated the subleased property on June 1. Thus, defendant's breach constructively evicted plaintiff from the subleased property for an extended period. "In the event of a 'breach of a material term of an agreement, the non-breaching party is relieved of is obligations under the agreement.'" Roach v. BM Motoring, LLC, 228 N.J. 163, 174 (2017) (quoting Nolan v. Lee Ho, 120 N.J. 465, 472 (1990)). The court's determination that defendant's breach excused plaintiff from the terms of the sublease is supported by credible evidence in the record.

"What amounts to a constructive eviction is a question of fact." Gottdiener v. Mailhot, 179 N.J. Super. 286, 293 (App. Div. 1981). A

constructive eviction occurs when a landlord's "act or omission . . . renders the premises substantially unsuitable for the purpose for which they are leased, or which seriously interferes with the beneficial enjoyment of the premises." Reste Realty Corp. v. Cooper, 53 N.J. 444, 457 (1969). Upon a constructive eviction, a tenant may be authorized to vacate the premises without further liability to pay rent under the lease. See id. at 459-60. A finding of "constructive eviction . . . must be based upon a substantial breach of the tenant's right to the quiet enjoyment of the leased premises." JS Props., L.L.C. v. Brown & Filson, Inc., 389 N.J. Super. 542, 548 (App. Div. 2006). "[A] tenant who declares the landlord in breach of a covenant of quiet enjoyment . . . need not vacate but must vacate if it seeks to terminate the lease and avoid further rent payments." Harel Assocs. v. Cooper Healthcare Pro. Servs., Inc., 271 N.J. Super. 405, 408 (App. Div. 1994).

We are unpersuaded by defendant's argument that it did not breach the sublease, because article seventeen of the sublease expressly provided no "warranty with respect to the condition of the" subleased property and that plaintiff assumed possession of the subleased property in "'as is' condition." While Nihalani undeniably inspected the subleased property, defendant fails to cite authority for its contention that plaintiff was required to do "due diligence"

on the fire alarm and sprinkler systems located throughout the entire building. The court correctly found plaintiff was precluded from its intended use under the sublease.

We also reject defendant's argument that plaintiff's "window to vacate the [p]remises and/or claim a constructive eviction expired on April 12, 2021." Providing deference to the court's factual findings, we discern no error in the court's conclusion that plaintiff timely sought to terminate the sublease and vacate the subleased property. The court reasoned: the parties attempted negotiations immediately after defendant served the April default notice; plaintiff deposited the total disputed rent in escrow; and plaintiff "filed this case by the end of April 2021." Notably, Kameo admitted to offering plaintiff the option to leave the building subject to a resolution on the issue of back rent. The court's finding that plaintiff timely notified defendant of its sublease termination after defendant's breach of the sublease is well supported by substantial, credible evidence in the record. See 160 W. Broadway Assocs. LP v. 1 Mem'l Drive, LLC, 466 N.J. Super. 600, 610 (App. Div. 2021) ("[W]e do not disturb the factual findings . . . of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant[,] and

reasonably credible evidence as to offend the interests of justice . . . ." (quoting Seidman, 205 N.J. at 169 (internal quotation marks omitted))).

We also reject defendant's argument that the court erred in its evidentiary rulings regarding Wynn's and Tri State's sublease responsibilities. As defendant acknowledged, plaintiff had requested documents regarding these entities during discovery, but defendant directed plaintiff to "documents available through eCourts." In response to plaintiff's request, defendant specifically referenced publicly available records, which is not the equivalent of providing available documents in discovery.

"[T]he decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). Evidentiary decisions will be upheld "if they are supported by adequate, substantial and credible evidence on the record." Est. of Hanges, 202 N.J. at 384 (quoting MacKinnon v. MacKinnon, 191 N.J. 240, 253-54 (2007)) (internal quotation marks omitted). We discern no error in the court's exclusion of evidence regarding Wynn and Tri State. Regardless of the court's evidentiary decision, we note defendant's proffered evidence regarding Wynn's and Tri State's alleged responsibility for the flammable products does not negate

26

defendant's obligation to maintain operable fire alarm and sprinkler systems under plaintiff's sublease. As the court correctly noted, the majority of the assistant fire marshal's ten UFC violations pertained to the systems' operation, not the flammable goods located in Tri State's subleased premises.

For these reasons, we affirm the court's finding that defendant breached plaintiff's sublease.

B.

Defendant next contends the court's award of damages to plaintiff is unsupported and calculated in error. While defendant challenges the total award, it specifically argues the court's award of "$55,008.90" for plaintiff's lost profits stemming from its inability to use space at its Edison facility "was based solely upon purported agreements with undisclosed companies to rent out space." Defendant posits plaintiff failed to produce "documents and information in support of this claim."

"Under contract law, a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract." Totaro, Duffy, Cannova and Co. v. Lane, Middleton & Co., 191 N.J. 1, 13 (2007) (quoting Pickett v. Lloyd's, 131 N.J. 457, 474 (1993)). Although a non-breaching party need not demonstrate "the exact amount of the loss," "the loss

must be a reasonably certain consequence of the breach." Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 409 (2011) (quoting Totaro, 191 N.J. at 14). "[U]nder New Jersey law, '[l]ost profits may be recoverable if they can be established with a "reasonable degree of certainty,"' but '[a]nticipated profits that are remote, uncertain or speculative . . . are not recoverable.'" Schwartz v. Menas, 251 N.J. 556, 576 (2022) (second and third alteration in original) (quoting Passaic Valley Sewerage Comm'rs v. St. Paul Fire & Marine Ins. Co., 206 N.J. 596, 609-10 (2011)); see also Totaro, 191 N.J. at 14 (noting "[p]roof of damages need not be done with exactitude . . . [and that] [i]t is therefore sufficient that the plaintiff prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate" (first alteration in original) (quoting Lane v. Oil Delivery, 216 N.J. Super. 413, 420 (App. Div. 1987))). "It is well-settled that parties injured by a breach of contract have a common law obligation to take reasonable steps to mitigate their damages." State v. Ernst & Young, L.L.P., 386 N.J. Super. 600, 617-18 (App. Div. 2006) (footnote omitted) (citing McDonald v. Mianecki, 79 N.J. 275, 299 (1979)). "Damages will not be recovered to the extent that the injured party could have avoided his losses through reasonable efforts without undue risk, burden or humiliation." Sean

Wood, L.L.C. v. Hegarty Grp., Inc., 422 N.J. Super. 500, 519 (App. Div. 2011) (quoting Ernst & Young, L.L.P., 386 N.J. Super. at 618) (internal quotation marks omitted).

These principles guide our review. After determining defendant's breach resulted in plaintiff's inability to use the subleased property for almost five months, the court found plaintiff was permitted to terminate the lease, excused from paying rent, and entitled to damages for costs and lost profits "attributable to defendant's breach." The court specifically awarded $14,000 for temporary storage costs based on Nihalani's credible testimony and admitted warehousing invoices memorializing the charges. Nihalani had testified that plaintiff subleased the property for business expansion and had planned inventory shipments to the subleased property. Notably, the court referenced plaintiff's exhibit P-46 and found the invoices for April 2021 and May 2021 demonstrated plaintiff's "use of temporary storage trailers" and "warehousing." The court also awarded $5,565.25 for "replacement warehouse space" as a "combination [of] . . . testimony and . . . invoices" proved. The court found plaintiff's exhibit "P-47 show[ed] damages" related to the incurred storage costs.

We note that defendant's failure to provide a complete record on appeal of the evidence the court referenced in its findings hampered, to a degree, our

29

review of these awarded damages. See R. 2:5-4(a) (stating in relevant part that "[t]he record on appeal shall consist of all papers on file in the court or courts . . . , with all entries as to matters made on the records of such courts"); see also R. 2:6-1(a)(1)(I) (providing that the appendix must contain parts of the record "essential to the proper consideration of the issues"). As we afford deference to the court's factual findings, which specifically referenced exhibits, we affirm the damages awarded of "$14,000 for temporary storage" and "$5,565.25" for "replacement warehouse space with Ace [Worldwide]." See Soc'y Hill Condo. Ass'n v. Soc'y Hill Assocs., 347 N.J. Super. 163, 177-78 (App. Div. 2002) (concluding that "[w]ithout the necessary documents . . . . [the court] ha[s] no alternative but to affirm").

However, we are constrained to reverse the court's award of $55,008.90 for plaintiff's lost profits from the use of its Edison facility because the court's decision is bereft of factual findings as to how it arrived at that amount. "[A]ppellate review can be impeded when" a trial court fails to "state its factual findings and conclusions of law on the record as required by Rule 1:7-4(a)." Lakhani v. Patel, 479 N.J. Super. 291, 297-98 (App. Div. 2024); see also R. 1:7-4(a) (requiring trial courts to make sufficient "find[ings] [of] . . . facts and state [their] conclusions of law"). A "trial [court] is required to 'state clearly its

30

factual findings and correlate them with the relevant legal conclusions.'" Gnall, 222 N.J. at 428 (quoting Curtis v. Finneran, 83 N.J. 563, 570 (1980)). "Naked conclusions do not satisfy the purpose of [Rule] 1:7-4." Rutgers Univ. Student Assembly (RUSA) v. Middlesex Cnty. Bd. of Elections, 438 N.J. Super. 93, 107 (App. Div. 2014) (alteration in original) (quoting Curtis, 83 N.J. at 570).

Plaintiff claimed $111,740.06 in lost profits from its inability to store third-party items at the Edison facility, and Nihalani testified to the loss based on a spreadsheet he created from plaintiff's ERP system. While the court referenced Nihalani's spreadsheet, exhibit "D-23B," regarding the "damages sought related to the additional use of space at" the Edison facility, the court awarded $55,008.90 without explaining how it determined the amount. The court stated that "if this space had been available and not used for this purpose, plaintiff could have used it" and that the damages were "reasonably supported by the testimony from December 2020 through May 2021." A review of the court's statements and exhibit D-23B fails to provide a sufficient factual foundation for the court's award. Stated another way, the court's bare conclusions are insufficient to support how it derived the amount.

For these reasons, we remand for the court to provide its factual findings and legal conclusions regarding plaintiff's damages demonstrated within a

31                                                                    A-3129-23

reasonable degree of certainty related to lost profits from having to use its Edison facility to store materials intended for the subleased property. We leave to the sound discretion of the court to reexamine its award of lost profit damages and express no opinion as to the ultimate outcome.

C.

Regarding the court's award of counsel fees, defendant argues that plaintiff "was not successful in enforcing any [s]ublease term" and "[wa]s not entitled to any award of attorneys' fees[,] as the [s]ublease's express language d[id] not permit any such recovery." Defendant contends the court's finding that plaintiff was entitled to counsel fees under the sublease warrants reversal, but its merits brief does not specifically challenge the amount of counsel fees awarded pursuant to Rule 4:42-9(b).

The court found plaintiff was entitled to counsel fees under the sublease and awarded $225,029.61 in its June 7, 2024 order. Article thirteen of the sublease states, "In the event any legal action has to be instituted to enforce any terms or provisions under this [l]ease, then the prevailing party in said action shall be entitled to recover a reasonable attorney's fee in addition to all costs of said action." The sublease therefore entitled plaintiff to counsel fees for prevailing on its breach of contract claim against defendant.

32

We recognize that a reviewing court should only disturb a court's determination of fees when the award "was based on irrelevant or inappropriate factors, or amounts to a clear error in judgment." Hansen v. Rite Aid Corp., 253 N.J 191, 212 (2023) (quoting Garmeaux v. DNV Concepts, Inc., 448 N.J. Super. 148, 156 (App. Div. 2016)). "[F]ee determinations are discretionary decisions by trial courts," which "we . . . rarely disturb" absent "clear error of law." JHC Indus. Servs., LLC v. Centurion Cos., Inc., 469 N.J. Super. 306, 312 (App. Div. 2021); accord Packard Bamberger & Cos. v. Collier, 167 N.J. 427, 444 (2001). As we have already discerned no error in the court's finding that defendant breached the sublease and that plaintiff established a quantum of damages, the court's awarding of counsel fees to plaintiff was appropriate given the plain language of article thirteen of the sublease.

Again, we recognize defendant did not challenge the court's findings pursuant to Rule 4:42-9(b) or the amount of fees awarded. However, because we are remanding for the court to make specific findings regarding plaintiff's lost profits damages, and the court may adjust the award, it must also consider the reasonableness of the counsel fee award in light of any change of damages awarded. Thus, if the court's total judgment amount of damages is different on remand, it is charged to revisit the reasonableness of the court's counsel fee

award pursuant to Rule 4:42-9(b). Specifically, under Rule of Professional Conduct 1.5(a)(4), the court shall address "the amount involved and the results obtained." Further, the court is charged to address any other appropriate factors. A party seeking attorneys' fees must establish reasonableness under the factors. See Seigelstein v. Shrewsbury Motors, Inc., 464 N.J. Super. 393, 405 (App. Div. 2020). Regardless of the source authorizing fee-shifting, the same reasonableness test governs. See Litton Indus., Inc., 200 N.J. at 386 (quoting Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 21-22 (2004)). It is within the sound discretion of the court to reexamine its award of counsel fees and decrease the amount if warranted based on a change in the amount of damages awarded for lost profits. Again, we express no opinion as to the ultimate outcome.

Finally, we conclude defendant's additional contentions that the judgment should be vacated, and it should be awarded damages for plaintiff's breach of the sublease for not paying $84,231.76 in rent are without merit, as the judgment is based on findings of fact that are adequately supported by the record. R. 2:11-3(e)(1)(A). To the extent not addressed, defendant's remaining contentions lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

A-3129-23

Affirmed in part, reversed in part, and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-3129-23